**HAMDI & IBRAHIM MANGO CO., LTD.,**
Plaintiff-Appellee and Cross-Appellant,

v.

**RELIANCE INSURANCE COMPANY,**
Defendant-Appellant and Cross-Appellee.

No. 141, Docket 26447.

United States Court of Appeals
Second Circuit.

Argued Jan. 4, 1961.

Decided April 27, 1961.

Rehearing Denied May 25, 1961.

On Motion to Recall Mandate
June 30, 1961.

Edward L. Smith, New York City (Kirlin, Campbell & Keating, New York City, on the brief), for plaintiff-appellee and cross-appellant.

Vincent L. Leibell, Jr., New York City (Martin P. Detels, Bigham, Englar, Jones & Houston, New York City, on the brief), for defendant-appellant and cross-appellee.

Before LUMBARD, Chief Judge, and SWAN and WATERMAN, Circuit Judges.

LUMBARD, Chief Judge.

This case turns on the construction of several contracts of insurance issued for the benefit of the plaintiff, a Jordanian merchant company (hereinafter Mango), by the predecessor in interest of the defendant, Reliance Insurance Co., a Pennsylvania corporation engaged in the business of marine and war risk insurance.

In 1947 Mango, which had recently become a Chrysler dealer for what was then Transjordan, contracted with the Export Division of the Chrysler Corporation for the purchase of certain cars, trucks and parts. These goods were to be transported from Detroit to New York City and Baltimore, and from there by sea to the port of Haifa in Palestine and then overland to Amman. Title to the goods was to pass to Mango when payment was made in New York through the Ottoman Bank upon presentation to the bank's New York correspondent of documents evidencing title. The freight forwarders procured for Mango certificates of insurance on the goods under an open policy (No. OP 939–N) issued to Chrysler in 1945, loss being payable to Chrysler until title and risk of loss passed to Mango, and it is the construction of several of these certificates which is in issue in this case. The insurance contracts were issued by the Fire Association of Philadelphia, to whose interest the Reliance Insurance Co. succeeded in 1958.

The goods were paid for, and transported from the United States in eighteen shipments under bills of lading dated between December 9, 1947, and March 25, 1948. All were landed in Haifa or Tel Aviv, pursuant to the instructions in the bills of lading which directed that the goods be unloaded at Haifa, or, if "discharging cannot be commenced immediately upon arrival and continued normally owing to interdict of * * * congestion," then at the nearest safe and convenient port. In the meantime, however, hostilities had broken out in Palestine between the Israelis and the Arabs after the resolution of partition adopted by the General Assembly of the United Nations on November 24, 1947.

The planned course of travel for the goods—overland from Haifa to Amman—was no longer feasible because passage was dangerous due to hostilities, and Mango decided to ship them by sea from Haifa or Tel Aviv to Beirut, whence they could be safely transported overland to Amman.

There were eighteen shipments in all. Fourteen were unloaded in Haifa. Seven of these, along with thirty-four cases from another shipment consisting of forty cases in all, reached Amman safely by way of Beirut. The other six cases in the eighth shipment had been stolen from the port area where they were stored, and the loss was discovered when arrangements for delivery to Beirut were being made on April 19, 1948. Of the six shipments which were delivered to Haifa and never arrived in Beirut, the evidence presented at the trial established that two shipments were destroyed by mortar fire during the clash between the Israelis and the Arabs in Haifa on April 21–22, 1948, and the other four disappeared from Haifa sometime between that date and June 24, 1948. Four shipments were unloaded in Tel Aviv, and all of these were requisitioned by the Israeli government in June and August 1948. Chrysler Corporation presented a claim to the Israeli government for one of these shipments since, due to a technical flaw in the transmission of documents, title had not passed to Mango. Partial payment was made to Chrysler, which then credited the receipts to Mango's account. Reimbursement for the other requisitioned shipments was not available since they had been seized as enemy property.

In a telegram dated March 14, 1948, and a letter dated March 15, 1948, Mango notified the Chrysler Corporation of the changed route, and requested Chrysler to arrange amendments of the insurance certificates. Another letter to the same effect, dated March 15, 1948, was addressed to the insurer, and requested amendment of thirteen specified certificates of insurance so "as to cover the route from Haifa to Beirut over sea and

from Beirut in transit to Amman on land," and to "extend the validity of these certificates to such a time as may be suficient for the merchandise to take until it reaches Amman via Beirut." In a letter of March 26, 1948, Chrysler requested the insurance agency through whom the certificates had been issued to arrange "proper insurance coverage" and obtain assurances from the insurer "that full protection will be extended in terms of the policy contract." On April 1, 1948, the insurer replied directly to Mango advising "that we are willing to extend the validity of these certificates subject to policy terms and conditions and additional premiums to be determined when full facts are known." Subsequently, the insurer issued seven endorsements to various of the certificates of insurance covering goods which had safely reached Amman, and extending the policy, "subject to all its terms and conditions," to include, "storage while awaiting transshipment, and during transshipment via Beirut, Syria."

The focus of inquiry in this case is whether the goods destroyed or lost in Haifa and those seized in Tel Aviv were covered by the terms of the insurance policies. Mango also demands reimbursement for its expenses in rerouting the seven-and-a-fraction shipments to Beirut under the clause of the insurance policy which obligates the insured to "sue, labor, and travel for, in and about the defense, safeguard and recovery of the * * * goods," and which grants a right of action against the insurer for such costs. Finally, Mango demands return of the premiums paid for the seven endorsements issued by the defendant on the ground that the endorsements granted no coverage beyond that provided by the certificates themselves, and that payment was made under mistake or duress.

## I.

The open policy issued to the Chrysler Corporation by the Fire Association of Philadelphia undertook to insure merchandise shipped by Chrysler, loss to be payable to Chrysler or to its order. Under this open policy, certificates of insurance were issued payable to Chrysler or to the Ottoman Bank to cover specific shipments. Chrysler endorsed its policies to the order of Mango. The certificates listed certain special conditions which, under the open policy's provision for written amendments, became terms of the contract of insurance. These conditions subjected the insurance relation to four specific standard clauses issued by the American Institute of Marine Underwriters: Amended F. C. & S. (Free of Capture and Seizure) Warranty (July 1945), Marine Extension Clauses (April 1943), S. R. & C. C. (Strikes, Riots and Civil Commotions) Endorsement Form No. 5–A (Feb. 1941), and War Risk Insurance Form 3–M (April 1947). The body of the certificates, all of which carried identical terms, provided that the insurance attach "from the time the goods leave the Warehouse and/or Store at the place named in the policy for the commencement of the transit * * * until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur * * * Held covered at a premium to be arranged in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the Assured."

Excluded from coverage under the policy were all the risks listed in the Amended F. C. & S. Warranty (July 1945), reproduced in the margin,[1] except.

1. "Amended F. C. & S. Warranty (July, 1945)
"The F. C. & S. Warranty in this policy is hereby amended to read as follows and as so amended shall be paramount and shall not be amended or superseded by any other provision included in this Policy or stamped or endorsed thereon.

to the extent that some "other provision refers specifically to the risks excluded" by the F. C. & S. Warranty. Since the warranty extended to "requisition or nationalization" and to "consequences of hostilities or warlike operations," the damage caused by the seizure in Tel Aviv or the bombardment in Haifa, if the latter amounted to a "warlike operation," would be covered only if expressly reassumed by some other clause. This was done by the War Risk Insurance Form which "separately insured" the shipments described in the certificates against "capture, seizure, destruction or damage by men-of-war * * * and other warlike operations * * * in prosecution of hostilities." The form provides that "insurance attaches only as the goods are first loaded on lighter, craft or vessel * * * and ceases to attach as the goods are finally landed from the vessel, craft or lighter at the final port or place of discharge." However, it "includes transshipment and intermediate overland transit, if any." Expressly denied coverage is "commandeering, preemption, requisition or nationalization by the government (de facto or otherwise) of the country to or from which the goods are insured." All insurance other than that provided by the War Risk Form was warehouse-to-warehouse coverage; war risks were covered only from the port of shipment to the port of discharge. All the certificates (except one which covered goods which arrived in Amman) described the shipments as traveling from Detroit to Amman via Haifa and New York.

The trial judge held that the goods stolen from the Haifa pier before the outbreak of hostilities were insured by reason of the warehouse-to-warehouse coverage of the open policy since the goods had not arrived at Amman, "the final warehouse at the destination named in the policy," and the loss was not due to warlike operations. On this appeal the defendant concedes liability for the value of these goods.

The trial judge further held that the correspondence between Mango and the insurer constituted an amendment of the destination as specified in the certificates of insurance from "Amman via Haifa and New York" to "Amman via Beirut and New York." He held that the activity in Haifa on April 21–22, 1948, amounted to "warlike operations," so that coverage was provided under the War Risk Form as to the enumerated certificates until the goods reached Beirut, the port of discharge under the amended certificates. As a result of the amendment, the court held, the "country to * * * which the goods are insured" under the War Risk Form became Syria (Lebanon) instead of Palestine. Thus, the seizure in Tel Aviv was not within the clause which denied coverage to requisitions by the country of destination. In sum, the district court granted a recovery for those goods covered by certificates enumerated in Mango's letter of March 15, 1948, which were lost or destroyed in Haifa or requisitioned in Tel

unless such other provision refers specifically to the risks excluded by this warranty and expressly assumes the said risks:—

"Notwithstanding anything herein contained to the contrary, this insurance is warranted free from capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof of any attempt thereat, whether in time of peace or war and whether lawful or otherwise; also warranted free from all consequences of hostilities or warlike operations (whether there be a declaration of war or not); but this warranty shall not exclude collision, contact with any fixed or floating object (other than mine or torpedo), stranding, heavy weather or fire unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purpose of this warranty "power" includes any authority maintaining naval, military or air forces in association with a power.

"Further warranted free from the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy."

Aviv. We agree with this construction of the correspondence and affirm that portion of the judgment of the district court which granted a recovery to the plaintiff.

Judge Sugarman found that a state of war existed in Haifa on April 21–22, 1948, when the goods stored at the Haifa port were destroyed. This finding is supported by the record and is a reasonable inference from the testimony adduced at the trial. Mango's right to recover for losses in Haifa therefore depends on the duration of coverage under the war-risk clause incorporated into the certificate of insurance by reference to the standard form.

Paragraph 8 of War Risk Insurance Form 3–M provides:

"The Assured and payee hereunder, the description and valuation of the merchandise, the sum insured, the voyage *and the ports of loading on and discharge from the overseas Vessel, shall be determined by reference to the attached Certificate or Special Policy and shall be deemed incorporated herein;* and losses payable hereunder shall be adjusted and settled in the same manner as provided for in the said Certificate or Special Policy. It is agreed, however, that this war risk insurance is a separate contract and (excepting as expressly provided in this clause 8) is not subject to any terms or conditions contained in or endorsed on the Certificate or Special Policy to which it is attached." [Emphasis added.]

The certificates, as originally drawn, provided that the insured shipments would reach Amman via Haifa. The central question before this court is whether the four-sided correspondence between Chrysler, Mango, the insurer, and the insurance agent, resulted in an amendment of this provision so as to cover the goods to Amman via Beirut. If the effect of the exchange of letters was to designate Beirut as the port of discharge, the goods, while in Haifa, were within the coverage of the war risk clause, and re-

covery on the policy should be allowed.

The telegram dated March 14, 1948, which was sent by Mango to Chrysler and then reproduced in Chrysler's letter to the insurance agent said in part:

"Due to prevailing unsettled position have no alternative but reship goods to Beirut in transit for Transjordan * * * Please make amendment policies to cover diversion via Beirut."

What was requested by Mango, therefore, was an *amendment* of the existing certificates to cover the route via Beirut, and not the issuance of new certificates to cover the Haifa-Beirut leg of the journey. The letter directly from Mango to the insurer, sent by air mail on March 15, 1948, asked for coverage "from Haifa to Beirut over sea and from Beirut in transit to Amman on land." In this correspondence, as well, Mango asked that the insurance be amended, not that new certificates issue. The letter of March 15 was headed:

"Subject: Amendment and extension of Certificates of Insurance issued to us according to the Chrysler Corporation, Export Division O. P. 939N owing to conditions beyond our control/ Clause C paragraph 3."

■■ The letter from Chrysler to the insurance agent, dated March 26, 1948, requested the agent to arrange for "full protection * * * in terms of the policy contract." The letter of acceptance from the insurer to Mango referred, as well, to "extension" of the certificates, and it manifested willingness "to extend the validity of these certificates." Thus, the parties in bargaining by letter sought to, and did agree to amend and extend the policies of insurance. The most reasonable construction of the amendment sought and granted by this correspondence is the substitution of "via Beirut" for "via Haifa." All the negotiations were completed before five shipments had arrived in Haifa where they were ultimately destroyed, and before three of the four shipments that were discharged in Tel Aviv had arrived there. Thus, on

April 1, 1948, when shipments were still under way, the insurer had obligated itself to cover the goods until Amman via Beirut. When they landed at Haifa, therefore, they were in the process of transshipment, which was expressly within the coverage of the war risk clause. Moreover, even the shipments which had already arrived at Haifa could be retroactively covered against war risks if such was the intention of the parties, see, e. g., Travelers Insurance Co. v. Wolfe, 6 Cir., 78 F.2d 78, certiorari denied 1935, 296 U.S. 635, 56 S.Ct. 158, 80 L.Ed. 452, and we find that such was the intent here. We construe the correspondence between the parties as amounting to a promise by the insurer, in consideration of added premiums to be determined, to amend the certificates to substitute "via Beirut" for "via Haifa." Judgment for the amount due under the policy had it been so amended was therefore proper. Franklin Insurance Co. v. Colt, 1874, 20 Wall. 560, 87 U.S. 560, 568–569, 22 L.Ed. 423.

■ The certificates which were not enumerated in Mango's letter of March 15 (i. e., Nos. 82789, 82407, 82178), however, were not made the subjects of the promise to amend. Since the loss of the goods covered by these certificates, two shipments destroyed in Haifa and one requisitioned in Tel Aviv with partial payment made to Chrysler, was caused by "warlike operations" after discharge in Haifa, and by seizure by the government to which the goods were insured under the unamended language of the certificates, the insurer was free of liability, and the district court's judgment exonerating the insurer on these policies is affirmed.

■ The insurer maintains, however, that the proper understanding of the correspondence between the parties was expressed by the seven endorsements issued in December 1948 on the goods which safely reached Amman. These endorsements extended the insurance "to cover storage while awaiting transshipment, and during transshipment, via Beirut, Syria." The endorsements also provided "that this protection includes the risks of strikes, riots, and civil commotions." Added premiums for storage, transshipment, and for strikes, riots and civil commotions coverage were assessed. The insurer maintains that Mango's acceptance of these endorsements without objection indicated that they conformed to the insured's understanding of the obligations arising from the correspondence, and that war risks were not covered by the endorsements. We disagree. We hold that the language of the endorsements, a sample of which is reproduced in the margin,[2] supports the trial court's

2. "Endorsement attached to and made part of Certificate #79974 of the Fire Association of Philadelphia issued to Chrysler Corporation.

"In consideration of the premiums charged below it is hereby understood and agreed that this insurance, subject to all its terms and conditions, is extended to cover storage while awaiting transshipment, and during transshipment, via Beirut, Syria.

"It is further understood and agreed that this protection includes the risks of strikes, riots, and civil commotions

| Amount | Term | Rate | | A/P |
|--------|------|------|---|-----|
| $22,440 | 2/6/48 to 3/ 8/48 | STG. | .25 | $ 56.10 |
| | | SR&CC | .75 | 168.30 |
| | 3/8/48 to 3/14/48 | STG. | .125 | 28.05 |
| | | SR&CC | 1% | 224.40 |
| | Transshipment via Beirut, Syria | | .25 | 56.10 |
| | Total | A/P | | $532.95 |

"All other terms and conditions of the certificate remain unchanged.

"Detroit Insurance Agency

"December 17, 1948"

conclusion as to the terms of the agreement. Even were this not true, it would be unfair to the insured to allow the terms of an agreement entered into in March to be defined by a self-serving endorsement issued unilaterally by the insurer in December, after the insurer learned that many shipments were destroyed by warlike operations in Haifa.

The insurer also maintains that Mango's letter of March 15 misled it into believing that the goods were already on board ship and no longer in the port of Haifa. The misleading language to which the insurer points is the statement, "We reshipped our merchandise from Haifa to Beirut Port in transit to Amman." However, the use of the past tense in this context is not so unequivocal that the insurer could have assumed that the goods had already left Haifa and were on their way to Beirut. If there were any doubt of this, the proper course for the insurer to have taken in self-protection would have been to inquire further before committing itself. Moreover, the telegram from Mango to Chrysler, quoted in the letter from Chrysler to the insurance agent, said, "Due to prevailing unsettled position have no alternative but reship goods to Beirut." The indication from this language is that the goods were yet to be reshipped, not that they were under way.

## II.

Mango's cross-appeal from the denial of its claim for expenses incurred in storing in Haifa and transporting to Beirut the goods which safely reached Amman is without merit. The cost of the added leg of the voyage is attributable to Mango's interest in keeping the goods from being damaged in Haifa. Had Mango decided to hold the shipments in Haifa until hostilities had ceased, it would have done so at its own risk, since the war risk clause would have expired once the goods were unloaded at Haifa, the port of discharge. By altering the route the shipments were to take, therefore, Mango was not protecting the insurer's interest but its own. Although the policy, once amended, placed the risk of losses due to warlike operations while the goods were in Haifa on the insurer, the cost of the decision to go via Beirut should be borne by the insured since it was the insured's interest that was promoted by the change of route.

The claim for return of premiums was also properly rejected by the district court. The extra leg of the journey—from Haifa to Beirut—was not a "deviation" within the terms of the policy since the planned trip to Haifa was completed. Mango requested and received added coverage by reason of an amendment to the policy, and the insurer was entitled by the terms of the insurance certificates to assess premiums for the amended coverage.

The district court's judgment for the plaintiff of $51,180.00 for the goods destroyed in Haifa and seized in Tel Aviv is affirmed. The court erroneously entered a judgment for $8,914.72 for the goods stolen from the Haifa port before the outbreak of hostilities, but it is agreed by the parties that this should have been $8,414.72.

Accordingly, we affirm the judgment and direct that it be corrected to award the plaintiff $59,594.72 with interest as assessed by the district court.

### On Petition for Rehearing

PER CURIAM.

The insurer now contends that since we held the insurance policies to have been amended by reason of certain correspondence between the Chrysler Company, the insurer, and the insured, we should have credited the insurer with an amount equal to the premiums which would have been assessed had the insurer issued endorsements covering the goods in Haifa. It seeks to excuse its failure to counterclaim for this amount in the district court by maintaining that the theory on which the insured prevailed in the trial court and on appeal—that the correspondence amounted to an amendment of the certificates—was not argued to the district court. Even if this allegation is taken as true, however, the in-

surer has not explained why it failed to mention this claim in its briefs and argument on appeal. Were the computation of premiums a simple mathematical one, we might not deem the claim to have been waived by the failure to raise the point on appeal. However, the seven endorsements introduced into evidence reveal that the calculation must be based on the length of time for which each shipment was insured at various locations and that the rates vary considerably. We do not, therefore, adopt the insurer's suggestion that we compute the premiums for the $51,180 award on the basis of the premium charged for the sample endorsement reproduced as footnote 2 of our opinion, and we hold that the failure to raise the point before the district judge and before us amounted to a waiver of the claim for premiums. United States v. Rodiek, 2 Cir., 1941, 120 F.2d 760, affirmed 1942, 315 U.S. 783, 62 S.Ct. 793, 86 L.Ed. 1190; Bassick Mfg. Co. v. Adams Grease Gun Corp., 2 Cir., 1931, 54 F.2d 285; see Independent Wireless Telegraph Co. v. Radio Corp. of America, 1926, 270 U.S. 84, 46 S.Ct. 224, 70 L.Ed. 481.

The insurer also maintains that certificates 82347 and 82158 were "not enumerated in Mango's letter of March 15," see p. 443 supra, and that under the test set forth in our opinion they were not, therefore, made the subjects of the promise to amend. Although the precise language that is quoted might support this argument, the context in which the statement appears quite clearly belies any such contention. The two certificates, though not enumerated in the letter sent by Mango to the insurer, were listed in Mango's telegram to Chrysler. Certificate No. 82158 was expressly included in that list and No. 82347 was referred to by its invoice number, 39789-1. The entire list, with details as to the names of the steamers and amounts of coverage, were supplied in tabular form in Chrysler's letter of March 26 to the insurer. The insurer's letter to Mango referred not only to Mango's letter of March 15 but to "a communication from

our assured advising that your cable had been received by them containing the same request." It was this letter, dated April 1, which expressed the insurer's intention to amend, and we read this intention as extending to all the policies enumerated in the earlier correspondence from Mango and Chrysler to the insurer.

The other points raised by the petition for rehearing are without merit.

The petition is denied.

Motion by Defendant to Recall Mandate in Order to Correct Same by Eliminating the Provision Awarding Costs to Plaintiff-Cross-Appellant.

PER CURIAM.

Defendant's appeal claimed plaintiff was awarded $51,180 too much. Plaintiff's cross-appeal claimed the award was about $42,000 too little. We think it fair that defendant should bear five-ninths and plaintiff four-ninths of the appellate costs. To this extent the motion is granted.