**TRANS WORLD AIRLINES, INC.,**
**Plaintiff,**

**v.**

**Howard R. HUGHES, Hughes Tool Company and Raymond M. Holliday,**
**Defendants.**

**No. 61 Civ. 2324.**

United States District Court,
S. D. New York.

June 10, 1970.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for plaintiff; Dudley B. Tenney, Paul W. Williams, Immanuel Kohn, Marshall H. Cox, Jr., and Michael P. Tierney, New York City, of counsel.

Donovan, Leisure, Newton & Irvine and Chester C. Davis, New York City, for defendants Hughes Tool Co. and Raymond M. Holliday; Ralstone R. Irvine, James V. Hayes, Chester C. Davis, George S. Leisure, Jr., Mahlon F. Perkins, Jr., Lola S. Lea, David A. Wier, and Paul E. Goodspeed, New York City, of counsel.

METZNER, District Judge.

Defendants move for a stay of execution, pending appeal, of the judgment entered in favor of the plaintiff without posting the usual supersedeas bond. Practically speaking, defendant Hughes Tool Company (hereinafter called Toolco) is the party involved in this motion.

F.R.C.P. 62(d) provides that "When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay subject to the exceptions contained in subdivision (a) of this rule. * * * " Rule 33 of the General Rules of this court provides that such bond shall be in the amount of the judgment plus 11% and an additional $250 to cover costs. Plaintiff in this antitrust action was awarded single damages of $45,870,478.65, which after trebling and adding costs and a reasonable attorney's fee amounts to $145,448,141.07. The bond would have to be in the amount of $161,447,686.59.

Rule 31(b) of the General Rules of this court provides that every bond or undertaking must either:

"(1) be secured by the deposit of cash or government bonds in the amount of the bond, undertaking or stipulation, or be secured by (2) the undertaking or guaranty of a corporate surety holding a certificate of authority from the Secretary of the Treasury * * *."

The third alternative provided by the rule is not applicable to this case.

It is Toolco's contention that either of the alternatives contained in Rule 31(b) "could not be effected without imposing an added penalty on [Toolco] by requiring it to engage in disruptive and time-consuming liquidation of assets or a costly and time-consuming financing program." It proposes that it either not be required to post any bond or undertaking, or that whenever the net worth of Toolco goes below three times the judgment the stay pending appeal shall be lifted.

Although the final judgment in this matter was not entered until April 14, 1970, the report of the special master recommending damages in the amount of $137,611,435.95 was confirmed by this court on December 23, 1969. Defendants apparently did nothing from that time until May 5, 1970 (the date of the order to show cause bringing on this motion) to arrange for the posting of

the required bond except to make inquiry of surety companies. Appended to the order to show cause are two letters from surety companies indicating that a bond of this size could be arranged only if secured with a deposit of collateral in the form of cash or government bonds or documents of similar liquidity in the full amount of the bond. The inability of surety companies to undertake such an obligation is fully understood and appreciated by the court.

Because of the unprecedented size of the judgment against what is in essence a single defendant, the court signed the order to show cause in an attempt to see if some satisfactory arrangement could be worked out whereby the interests of the successful plaintiff could be reconciled with the understandable, practical problems facing Toolco. Hearings were held on May 11, May 20 and June 3 which were unproductive in bringing the parties close to a solution of the problem.

At the outset the brief submitted by Toolco took the position that the law was clear to the effect that the court has the power "in extraordinary circumstances such as those presented by this case, to grant a stay of execution without requiring the filing of a supersedeas bond in the ordinary form or the posting of any security." It argued that its net worth was -in excess of $500,000,000 and that this was ample assurance that the plaintiff would be able, in the event of affirmance, to obtain satisfaction of its judgment without the posting of any security at the present time. In addition, it offered that a lien could be created on specific property having a value in excess of $45,000,000, the amount of the compensatory portion of the judgment. The plaintiff took the position that Rule 33, requiring a bond in the amount of 111% of the judgment, indicates that any lower figure is most unlikely to be sufficient security for the payment of a judgment.

■ With the adoption of the Federal Rules of Appellate Procedure, effective July 1, 1968, Rule 73(d) of the Federal Rules of Civil Procedure, which referred to supersedeas bonds on appeals to the Court of Appeals, was repealed. It had provided, among other things, that:

> "the amount of the bond shall be fixed at such sum as will cover the whole amount of the judgment remaining unsatisfied, costs on appeal, interest, and damages for delay, unless the court, after notice and hearing and for good cause shown, fixes a different amount * * *."

These words had been inserted in the original rule in 1938 to cover situations where money judgments of enormous sums had been entered and defendants were unable to give a supersedeas bond to stay the execution of a judgment. The language allowed the court, in a case of hardship of that kind, to issue a stay of execution so that, in effect, the defendant's right of appeal would not be destroyed. The language was not transferred to any other section of the rules by the amendment of 1968, and consequently the court is faced with F.R.C.P. 62(d) and our local district Rule 33. Despite the repeal of Rule 73(d), I am of the opinion that the court has the inherent power in extraordinary circumstances to provide for the form and amount of security for a stay pending appeal, based on the conditions it finds to exist. in a particular case. See 9 Moore, Federal Practice ¶ 208.06[1] at 1416 (2d ed. 1969).

At the first hearing on May 11, the parties adhered to their diametrically opposed positions. The plaintiff pointed out that there was no assurance that Toolco's present net worth would continue to exist. It further took the position that during the period from December to May Toolco, with its asserted net worth, could have arranged for a loan to be used as an undertaking. Plaintiff suggested that Howard Hughes, the sole owner of the stock of Toolco, should guarantee the payment of the judgment and place his stock with the court as collateral for such guaranty.

If consideration was to be given to Toolco's proposal, plaintiff asserted that

it should receive the same treatment as would be afforded any lending institution approached for a loan by Toolco. This would include certified, detailed financial statements, regular certificates by responsible officers of defendants as to the maintenance of net worth and limitations on transactions between Toolco and its 100% stockholder. However, plaintiff adhered to its view that Toolco should arrange for financing in order to secure the judgment in full.

The hearing was adjourned to May 20 with a direction to the defendants to conduct negotiations with lending institutions. Counsel were admonished to have continuing discussions so that on the adjourned date the plaintiff would not be faced with a new proposal for the first time.

The fear of the court was well founded since it appears that Toolco's new proposal was sent to plaintiff's counsel the day before the adjourned hearing. That proposal contained four provisos:

"1. HTCo [Toolco] will furnish TWA with a Certificate by its Treasurer certifying that the present net worth of the Company, determined in accordance with generally accepted accounting principles applied on a basis consistent with prior accounting periods, without provision for the judgment, is in excess of $500 million, namely, substantially in excess of three times the amount of the judgment.

"2. Thereafter, HTCo will provide TWA quarterly, or more frequently if desired, with a Certificate of its Treasurer certifying that the net worth of HTCo remains substantially in excess of three times the amount of the judgment.

"3. Haskins & Sells advises that they will have completed their audit for the year ended December 31, 1969 by the end of the month. HTCo will immediately engage Haskins & Sells to make quarterly audits. Shortly after such engagement Haskins & Sells will be able to complete interim audit procedures for the first quarter of 1970.

"4. HTCo will provide TWA with an appropriate Certificate of Haskins & Sells based upon such audits which will support the Treasurer's Certificate and, in addition, based upon interim auditing procedures Haskins & Sells will provide TWA from time to time with a confirmation in the form of a 'comfort letter', customarily furnished to underwriters, to the effect that nothing has come to their attention subsequent to their last audit to indicate that the net worth of the Company has been reduced to an amount which is not in excess of three times the amount of the judgment."

The letter ended with the following statement: "Based on our telephone conversation, I expect to hear from you to arrange a meeting for this afternoon to discuss the matter further." On the same date plaintiff submitted a nine-page proposal as to what it was willing to accept.

The hearing proceeded on May 20, in which counsel for Toolco outlined the discussions had with the banks. The following statement by counsel appears on page 16 of the transcript:

"So you reduce all that and you say: What does that mean in terms of how much you can do?

"And they say: Well, we don't know exactly yet but we would be happy to do it.

"What will it cost?

"Well, we cannot exactly tell you what terms and conditions.

"But you put all those together and the only conclusion you come to is that it is not realistic *   *   *."

The interesting point about all this is that Toolco never requested the banks to follow through and come up with definitive answers. It took the position that whatever the cost, it would be unduly burdensome. If Toolco had wanted financing to conclude a business transaction, I am sure that there would have

been no hesitancy on its part to get the concrete answers, but somehow it did not take that tack to solve this problem. The hearing was adjourned to June 3 with a direction to Toolco to furnish the plaintiff with the audited financial statements of its operations for the year 1969 and a list of its assets worth $10,000,000 or more. This was done for the purpose of giving the plaintiff an opportunity to know what was being offered and to be in a position to evaluate whether it would be sufficient to secure its judgment.

Aside from charges and countercharges of bad faith, a large portion of the hearing on June 3 was devoted to a statement by defense counsel as to the huge capital demands being made on Toolco by its subsidiaries and affiliates. The sum total of all this was that there could be nothing available for the plaintiff by way of cash security. Business was to continue as usual with Toolco being the sole arbiter of what it wanted to do. Cash could be converted to fixed assets which would not affect the net worth of the company as reflected on a balance sheet. However, it could certainly affect what I would call the quality of that net worth insofar as the collection of the judgment is concerned. We read every day about the liquidity squeeze.

The figures which were furnished the plaintiff indicate that in the three-month period ending March 31, 1970 the quick current assets have been reduced by a third. In addition, the court received a letter from Toolco's counsel dated May 22, 1970 stating that the court should not be surprised to read an announcement in the press, either late that day or the next day, that Toolco had acquired the Dunes Hotel for a cash consideration of $35,000,000 and that there was a contemplated transaction in which Toolco would be called upon to lay out another $11,000,000 within the next six or eight months. There are additional examples of cash commitments in the financial notes to which I need not specifically refer.

Part of business as usual must include some recognition of the rights of this plaintiff that has acquired a judgment against Toolco for violation of the antitrust laws of the United States. Toolco requests plaintiff to forgo both immediate collection of its judgment and full security for that judgment pending appeal. It must be prepared to assume some financial burden to achieve "business as usual." At the same time, I fully appreciate that under present conditions a supersedeas bond in the amount contemplated by Rule 33 is not practicable under the circumstances. I have come to the conclusion that Toolco can arrange to post security in the form required by Rule 31(b) in the amount of $75,000,000. This shall be done on or before June 22, 1970. The balance of $86,447,686.59 shall be secured along the lines suggested by the defendants as to the maintenance of Toolco's net worth at three times the amount of such balance. The details of this arrangement shall be worked out between counsel. Each knows what the other has proposed. The court cannot be expected, on the papers before it, to come up with a satisfactory resolution embodying such detailed and intricate financial considerations. It should not be required to devote the time necessary to preside over such a conference between counsel. Obviously, there has to be flexibility on both sides for this endeavor to be successful.

Counsel are directed to meet in continuous session and appear before the court on June 16 in Room 1106 at 10:30 A.M. with a proposal in such form that any needed resolution of disputes can easily be disposed of.

So ordered.