**TRANS WORLD AIRLINES, INC., Appellee,**

v.

**Howard R. HUGHES et al., Appellants.**

**No. 2, Docket 74–1243.**

United States Court of Appeals, Second Circuit.

Argued Oct. 22, 1974.

Decided March 7, 1975.

---

Maxwell E. Cox, Davis & Cox, New York City (Chester C. Davis, David S. Dubin, New York City, of counsel), for appellant Hughes.

Dudley B. Tenney, Cahill, Gordon & Reindel, New York City (Paul W. Williams, Marshall Cox, Michael P. Tierney, New York City, of counsel), for appellee.

Before MOORE, OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

On April 14, 1970, Trans World Airlines, Inc. (TWA), was awarded by the United States District Court for the Southern District of New York, Charles M. Metzner, Judge, a default judgment in the amount of $145,448,141.07 in a private antitrust action brought by TWA against Hughes Tool Co. (Toolco).[1] The judgment was subsequently affirmed by this court, Trans World Airlines, Inc. v. Hughes, 449 F.2d 51 (2d Cir. 1971), but reversed by the Supreme Court. Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). This appeal, by defendant-appellants Howard Hughes, Toolco and Raymond M. Holliday, is from an order disallowing costs in connection with the successful appeal to the Supreme Court. Since the original judgment was one of the largest ever granted by a United States court, it is not altogether surprising that the costs involved in connection with the prosecution of the appeal are themselves more substantial than run of the mill judgments even in the Second Circuit. The principles pertaining to cost recovery, however, must remain the same.

The costs disallowed by the district court were a portion of the expenses incurred by Toolco in obtaining a stay of execution pending appeal. Because of the unprecedented size of the judgment, the obtaining of a supersedeas bond was impracticable. For this reason Judge Metzner granted a stay of the execution of the judgment pending appeal on condition that Toolco (1) post security by way of a letter of credit in favor of TWA in the amount of $75 million and (2) secure the $83 million plus balance of the judgment, by maintaining its net worth at more than three times the amount of that balance. Toolco was further required to furnish TWA with quarterly statements audited by its independent public accountants to evidence that net worth.

After the successful appeal to the Supreme Court, the district court judge allowed to the Hughes appellants a charge equal to $1,015,625 which was the amount of the fee (one half of one per cent per annum interest) paid on the $75 million letter of credit issued by the Bank of America in lieu of a supersedeas bond. The court disallowed, however, $617,765 in charges for the quarterly audits which were made in connection with furnishing certifications concerning the maintenance of Toolco's net worth at the special level. In addition, the courts disallowed $66,040.40 expended by Toolco in connection with providing security to the Bank of America as required under the terms of the letter of credit.

Also involved in this appeal is the allowance of a setoff of $4,602.55 in expenses incurred in the district court by TWA preparatory to the taking of a dep-

---

1. While in December, 1972, Hughes Tool Co. changed its name to Summa Corporation, for convenience the prior name is used throughout this opinion.

osition of Hughes which was never taken because he failed to appear. We affirm the judgment below in part and reverse it in part.

However costs on appeal have been treated in the past, see, e. g., Broffe v. Horton, 173 F.2d 565, 566 (2d Cir. 1949); Land Oberoesterreich v. Gude, 93 F.2d 292, 293 (2d Cir. (1937); Williams v. Sawyer Bros., Inc., 51 F.2d 1004, 1006 (2d Cir. 1931), they are now governed by Fed.R.App.P. 39(a) and (e). Under Rule 39(a), "Except as otherwise provided by law . . . if a judgment is reversed, costs shall be taxed against the appellee unless otherwise ordered . . . ." Under Rule 39(e), "the premiums paid for cost of supersedeas bonds or other bonds to preserve rights pending appeal . . . shall be taxed in the district court as costs of the appeal in favor of the party entitled to costs under this rule." [2] The district court disallowed the quarterly audit charges, saying,

> These audits were accepted by the court at the request of the defendant as a less drastic but more costly form of protection of the judgment covered by the plaintiff. It is perfectly clear from the proceedings in the spring of 1970 that Toolco was most interested in conducting business as usual. 314 F.Supp. 94 (S.D.N.Y.1970). Since the defendant needed and was using millions of dollars to buy a hotel and an airline, and making alterations to hotels at the time it was called on to bond the judgment, it should bear the costs of allowing business to go on as usual.

It is necessary, even if not conclusive of the result, to see just how the charges for the audit came about. Adoption of the Federal Rules of Appellate Proce-

dure, effective July 1, 1968, resulted in the repeal of Fed.R.Civ.P. 73(d) which had provided that the district court should fix a supersedeas bond in "the whole amount of the judgment remaining unsatisfied . . . unless the court after notice and hearing and for good cause shown fixes a different amount . . . ." That language permitted the district court in a case of hardship to issue a stay of execution, but after the repeal of Rule 73(d) the only requirements relating to supersedeas bonds were Fed.R. Civ.P. 62(d) and Local Rule 33 of the Rules of the District Court for the Southern District of New York, neither of which contained the express language of former Fed.R.Civ.P. 73(d) allowing discretion to the district judge in fixing bond provisions for appeal.[3] Nevertheless, exercising discretion, District Judge Metzner quite properly held that he had the power to provide for a form and amount of security different from the supersedeas bond. See 9 J. Moore, Federal Practice ¶ 208.06 [1] at 1416 (2d ed. 1969).

The district court's decision in this matter came only after a number of hearings at which TWA and Toolco expressed their diametrically opposed positions with respect to the need for a bond to protect the judgment during appeal. The Hughes appellants argued that since Toolco (100% owned by Hughes) had over $500 million in net worth, there was no need to post any bond. Instead, Toolco offered to create a lien on specific property having a value in excess of $45 million, the amount of the compensatory portion of the judgment. TWA countered by demanding either full payment of the judgment or the posting of a bond

---

**2.** Rule 57 of the Rules of the Supreme Court which deals with costs on appeal sheds no light on the proper treatment of premiums paid for bonds necessary to preserve rights pending appeal. The Supreme Court Rule states only that

> In cases of reversal or vacating of any judgment or decree by this court, costs shall be allowed to the appellant or peti-

tioner, unless otherwise ordered by the court.

**3.** Rule 33 of the General Rules of the District Court for the Southern District of New York provided that the bond should be in the amount of 111 per cent of the judgment and an additional $250 to cover costs. This would have required a bond in excess of $161 million.

in the amount of $161 million as required by Local Rule 33, n.3 *supra.*

After the court indicated an unwillingness to accept either of these extreme positions, Toolco made the further offer to provide TWA throughout the pendency of the appeal with financial reports evidencing that Toolco's net worth remained in excess of three times the amount of the judgment. The court made its ultimate decision after considering that during the court of negotiations relative to the supersedeas bond Toolco acquired The Dunes Hotel in Las Vegas, Nevada, for a cash consideration of $35 million and was engaged in another transaction in which it would be required to expend another $11 million. In ruling on the bond for appeal, the district court said, "Part of business as usual must include some recognition of the rights of this plaintiff that has acquired a judgment against Toolco for violation of the antitrust laws of the United States . . . . It must be prepared to assume some financial burden to achieve 'business as usual.'" At the same time, however, the court stated that it "fully appreciate[d] that under present conditions a supersedeas bond in the amount contemplated by Rule 33 is not practicable under the circumstances."

The court then went on to order Toolco to post security in the form required by General Rule 31(b)[4] in the amount of $75 million. Judge Metzner ordered that the balance of $86,447,686.59 "shall be secured along the lines suggested by the defendants as to the maintenance of Toolco's net worth at three times the amount of such balance" and directed the parties to come up with the details of that arrangement. After the usual sparring the embattled parties did so. As previously stated, a letter of credit was obtained, with agreement by the parties, as an acceptable substitute for the $75 million bond which would otherwise have been required. The parties agreed that the net worth which Toolco would maintain would be $335 million and that within 120 days of the end of each calendar quarter there would be presented audited and certified balance sheets to that effect, together with certificates by the treasurer of Toolco as to the maintenance of that net worth. The Hughes appellants also agreed not to distribute or transfer assets to reduce the net worth to less than the $335 million amount. This was incorporated in a consent order executed by the parties and approved by the court.

In our view the costs of the audits under the consent order were costs in lieu of providing a supersedeas bond as provided by the rules.[5] Just as the court allowed the one-half of one per cent premium on the letter of credit, so too it should have allowed the costs for the audits. To be sure, this was a price of doing business as usual, but that is true in the case of any supersedeas bond on appeal. We fail to see how the court's wise exercise of its discretion in an unusual case not to require security by way of a bond may be used to justify the disallowance of the costs of procuring alternate security for the appeal. When a judgment is reversed, as this one was, the costs of obtaining a supersedeas bond have long been held to be a proper item of costs. Berner v. British Commonwealth Pacific Airlines, Ltd., 362 F.2d 799 (2d Cir. 1966); Land Oberoest-

4. General Rule 31(b) provides that every bond or undertaking must either "(1) be secured by the deposit of cash or government bonds in the amount of the bond, undertaking or stipulation or be secured by (2) the undertaking or guaranty of a corporate surety holding a certificate of authority from the Secretary of the Treasury."

5. TWA seems to make the suggestion, but does not really argue, that the Hughes appellants' failure to press their motion filed August 9, 1961, to dismiss and for summary judgment on the ground that the anti-trust violations were within the jurisdiction of the CAB somehow disentitles them to costs here. But this was not a ground for the decision below and there is no showing that, even if pressed, the district court or court of appeals would have found any other way, or that TWA could not have itself pressed for a hearing on the motion.

erreich v. Gude, *supra.* If a defendant has to liquidate all or a substantial part of his business in order to exercise the right to appeal, then the appeal may surely be of doubtful value. The purpose of the stay was to permit Toolco to conduct business as usual, and so long as TWA was adequately secured Toolco was entitled to do so; in that sense, the cost of any supersedeas bond is always a cost incurred to permit business as usual. We do not see how any distinction can be made between the interest payable for the letter of credit on the one hand and the quarterly audits on the other, since they both went to providing adequate security to TWA. While, to be sure, costs are allowable in the exercise of the district court's discretion,[6] that discretion must not be exercised arbitrarily; "Discretion without a criterion for its exercise is authorization of arbitrariness." Brown v. Allen, 344 U.S. 443, 496, 73 S.Ct. 397, 441, 97 L.Ed. 469 (1953). The district court sets forth no criterion for the disallowance of this item of costs. Indeed, the cost of the audits protected $86 million of the judgment for a period of two and three-quarters years, which is less than one-third of one per cent a year, or, in other words, less than the fee allowed in connection with the letter of credit. Had a letter of credit been obtained for the full amount of the judgment and the same one-half of one per cent been charged, it would have generated a fee amounting to an additional $552,000 in excess of the $617,000 of audit costs.

The district court disallowed the $66,040.40 costs of securing the letter of credit without stating any reason therefor. The security consisted of a real estate loan granted against a recorded deed of trust on properties owned by Hughes in California. In conjunction with the preparation and documentation of that real estate loan Hughes paid the Bank of America a fee of $12,500 and in addition paid $53,488.80 for title insurance plus $51.60 for the recording of the deed of trust.

It appears on uncontradicted affidavits of the Bank of America that "a condition precedent" to the issuance of the letter of credit was that it be secured by Hughes. The costs in connection with furnishing this security would surely be allowable were it not for the fact that the terms of the letter of credit indicate that it also constituted security for "any other obligations" of Toolco to the Bank of America. While it may be, as TWA suggests, that the Bank of America had for many years been the lending bank both for Toolco and for Howard Hughes personally, no objection is taken here to the allowance of the costs of the one-half of one per cent charged by the bank for the letter of credit, and the logic in disallowance of the costs in connection with the security that were "a condition precedent to the issuance of the letter of credit . . ." escapes us. Regardless of Hughes' or Toolco's previous course of dealings with the bank, apparently the bank insisted upon additional security for the issuance of the $75 million letter of credit, an insistence which we do not find terribly extraordinary. In our view it would be arbitrary to treat the costs for security any differently from the fee charged for the letter of credit itself, and, of course, we have in mind that the letter of credit arrangement, which was consented to and approved by TWA, did indeed cost less than a surety bond would have cost and hence in the end—because TWA lost on the appeal—saved it money. As we have said, TWA cannot dispute that had a surety bond been furnished the costs of premiums therefor would have been taxable to it as the unsuccessful appellee. *Cf.* Sunkist

---

6. *See, e. g.,* Fanchon & Marco, Inc. v. Paramount Pictures, 202 F.2d 731 (1953), where successful appellants recovered only one-half of their costs on appeal, both because they were only partially successful with respect to the issues raised on appeal and because they printed an unnecessarily large transcript for appeal. *See also* Hamdi & Ibrahim Mango Co. v. Reliance Insurance Co., 291 F.2d 437 (2d Cir. 1961), where there was an appeal and cross appeal and costs of the appeal were apportioned.

Growers Inc. v. Winckler & Smith Citrus Products, 316 F.2d 275 (9th Cir. 1962).

■ With a measure of gall, however, defendant-appellants contest the award by the district court to TWA of a setoff of $4,602.65 for their expenses incurred in preparation for the Hughes deposition that was precipitously canceled by the last-minute announcement that Hughes would not appear. The imposition of this item was a proper exercise of the court's discretion under Fed.R.Civ.P. 37(b)(2) because the appellants chose at the last possible moment to disobey the court's lawful order that Hughes appear for his deposition on February 11, 1963. Any contention that the fact that the Hughes appellants ultimately prevailed in the appeal entitles them not to have this setoff is purely frivolous. Awards under Rule 37(b)(2) are made in connection with the court's internal control over its own procedures and are necessary to the proper administration of discovery proceedings which in turn are essential to the conduct in an orderly fashion of law suits under the Federal Rules of Civil Procedure. *See, e. g.,* Gibbs v. Blackwelder, 346 F.2d 943, 947 (4th Cir. 1965); Haney v. Woodward & Lothrop, Inc., 330 F.2d 940, 946 (4th Cir. 1964).

Judgment affirmed in part, reversed in part; costs on this appeal to neither party.

TIMBERS, Circuit Judge (dissenting):

There are few areas where I had supposed it was more axiomatic that the exercise of discretion by a trial judge should not be disturbed absent the clearest showing of abuse than in the taxation of costs. To the extent that the majority substitutes its discretion for that of the trial judge who had disallowed expenses of $617,765 incurred by Toolco in providing quarterly audit reports to TWA concerning Toolco's net worth, I respectfully dissent.

With respect to Judge Metzner's disallowance of this item of costs,[1] there not only was no showing of abuse of discretion, but in my view the record demonstrates with abundant clarity that the judge's action represents a classic exercise of sound discretion by a thoroughly experienced trial judge in the context of exceedingly complex litigation with which he has lived for a decade and a half.

I agree with the majority that allowance or disallowance of this item of costs was within the discretion of the district court. The narrow issue before us therefore is whether the record demonstrates "the court's wise exercise of its discretion", as the majority correctly states. P. 177 *supra*. The crux of the majority's reversal of Judge Metzner's disallowance of the expenses of the quarterly audit reports appears to be its belief that "[t]he district court sets forth no criterion for the disallowance of this item of costs." P. 178 *supra*. With deference, I disagree. Viewed as a whole, the record clearly supports the district court's exercise of discretion.

During the period from May 20 to June 3, 1970, Judge Metzner conducted three hearings with respect to the appropriate means by which Toolco, pending appeal, might secure the $145,448,141.07 judgment which had been entered against it. On June 10, 1970, the judge entered an order directing Toolco to post security in the form of a $75 million bond, with the balance of the judgment to be secured "along the lines suggested [by Toolco] as to the maintenance of Toolco's net worth at three times the amount of such balance." Thereafter, counsel for Toolco and counsel for TWA arranged for Toolco to post a $75 million supersedeas bond and for Toolco to maintain its net worth at $335 million. On June 16, 1970, the judge entered an order embodying this arrangement. In

1. I agree with the majority's disposition of the other two challenged items of costs involved on this appeal, i. e. the affirmance of the district court's allowance of a setoff to TWA of $4,602.65 deposition expenses incurred by it as a result of Hughes' contumacy, and the allowance to Toolco of $66,040.40 expenses incurred by it in obtaining the $75 million letter of credit.

accordance with Toolco's previous offers, the order directed Toolco to furnish TWA with certified quarterly audits to demonstrate that Toolco's net worth was so maintained. On June 25, 1970, the judge modified his prior order and permitted Toolco to substitute a $75 million letter of credit for the supersedeas bond.

If this were all that the record showed, I would agree with the majority that the expenses of the quarterly audit reports might appropriately be held to be costs reasonably incidental to securing TWA's judgment and therefore properly chargeable to TWA upon the ultimate reversal by the Supreme Court. Berner v. British Commonwealth Pacific Airlines, Ltd., 362 F.2d 799 (2 Cir. 1966). But the record discloses other critical facts which in my view have a direct bearing on the district court's exercise of discretion in disallowing this item of costs.

The district court's order of June 10, 1970 emerged only after intense acrimony between the parties and counsel regarding the security to be provided. Toolco repeatedly rejected suggestions by the court and by TWA with respect to means by which Toolco might secure the judgment at little or no cost to it and with minimal disruption of its business. For example, Toolco rejected suggestions that Hughes, the sole stockholder of Toolco, subject himself to the jurisdiction of the court for the sole purpose of guaranteeing payment of the judgment; that Hughes pledge his stock in Toolco to TWA, coupled with a court ordered restriction on the payment of dividends by Toolco to Hughes or any other material disposition of Toolco assets to Hughes or otherwise; that Toolco deposit marketable securities or other cash equivalents to secure the judgment; or that Toolco give TWA liens on certain of Toolco's properties. Each of these suggestions was rejected by Toolco in favor of the obviously more costly program of net worth maintenance upon which Toolco insisted. In short, Toolco demanded, as a condition to its securing a judgment against it for violation of the antitrust laws of the United States, that it be permitted to do "business as usual", including the acquisition of the Dunes Hotel in Las Vegas, Nevada, for $35 million cash and the expenditure of millions of dollars for other acquisitions.

A fair reading of the transcript of November 15, 1973 where TWA's exceptions to the Clerk's taxation of costs were considered, and the district court's order of January 10, 1974 disallowing the audit expenses, far from setting forth "no criterion for the disallowance of this item of costs" as the majority suggests, p. 178 supra, demonstrates that the district court based its disallowance of the audit expenses on its finding that such expenses were unnecessary and unreasonable in light of the other less costly alternatives which had been suggested to Toolco but categorically rejected by it.

The majority in effect has substituted its discretion for that of the trial judge who disallowed the audit expenses upon the express finding that "[t]hese audits were accepted by the court at the request of defendant as a less drastic but more costly form of protection of the judgment recovered by the plaintiff . . . . Since the defendant needed and was using millions of dollars to buy a hotel and an airline, and making alterations to hotels at the time it was called on to bond the judgment, it should bear the cost of allowing business to go on as usual." Opinion and Order of Judge Metzner dated January 10, 1974.

The majority's brushing off this finding of the district court results in placing the imprimatur of this Court on permitting a party called upon to bond a judgment to conduct business as usual pending appeal and then to saddle his opponent with the expenses of doing so—in the teeth of an express finding by the district court that such expenses were unnecessarily costly, clearly avoidable and therefore not properly chargeable as taxable costs.

Finally, the unfortunate precedent which the majority establishes in this most unappealing case strikes me as ignoring the admonition of the Supreme

Court in Farmer v. Arabian American Oil Company, 379 U.S. 227, 235 (1964), that:

"Items proposed by winning parties as costs should always be given careful scrutiny. Any other practice would be too great a movement in the direction of some systems of jurisprudence that are willing, if not indeed anxious, to allow litigation costs so high as to discourage litigants from bringing lawsuits, no matter how meritorious they might in good faith believe their claims to be." [2]

I respectfully dissent.

2. The Supreme Court in *Farmer* reversed an en banc decision of the Court of Appeals for the Second Circuit, 324 F.2d 359, and affirmed the District Court's exercise of discretion in the taxation of costs. 31 F.R.D. 191 (Weinfeld, J.). Judge Smith, speaking for three of the dissenters in the Court of Appeals, summarized their rationale in noting that the decision of the majority

" . . . abandons the traditional scheme of costs in American courts to turn in the direction of the English practice of making the unsuccessful litigant pay his opponent's litigation expense as well as his own. It has not been accident that the American litigant must bear his own cost of counsel and other trial expense save for minimal court costs, but a deliberate choice to ensure that access to the courts be not effectively denied those of moderate means." 324 F.2d at 365.