EASTERBROOK, Circuit Judge,
concurring.
A judgment creditor holds a general, unsecured debt. It is different from other unsecured debt only to the extent the judgment creditor also has a right to immediate execution. The function of a supercedeas bond is to protect the judgment creditor’s position from erosion during any period that its right to execute is obstructed by a stay pending appeal — erosion that could occur if the creditor’s financial position takes a turn for the worse or the creditor puts assets beyond the debtor’s reach. It is an important safeguard. Often it takes many years to get a judgment (this suit was filed in 1977 and concerns acts from still earlier years); during the suit the judgment creditor’s claim may slip behind the claims of other creditors. The deliberate speed of the law ought not to cause still further erosion in the creditor’s position.
If on the day of judgment the creditor has the liquid assets to pay in full, or the ability to borrow enough to pay, then the bond does nothing except assure the prevailing party that it will recover no less after the appeal is over. Things get sticky when the defendant cannot pay in full, or at once, because of financial difficulties.
On the one hand it seems this is just the case for which the bond is designed — the financial distress of the debtor puts the judgment creditor in peril if it waits for the appeal to take its course. The defendant may fail, leaving other creditors to collect while the judgment creditor is stymied; or the debtor may “reorganize” in a way that puts assets beyond the judgment creditor’s reach.
On the other hand a bond or irrevocable letter of credit prefers the judgment creditor over other creditors. The bond assures the judgment creditor of payment in full. It puts the assets of a solvent bank or bonding company behind the obligation, while other creditors must look to the assets of the debtor; the guarantor of the judgment will take security in the debtor’s assets, which causes the position of other creditors to deteriorate. The bond does not preserve the judgment creditor’s position; it improves the position, perhaps dramatically. If on the day of judgment the debt was worth 50 cents on the dollar, the judgment creditor should be made secure to this extent but to this extent only. Anything else is a preference over other creditors. Yet the bond or letter of credit will assure payment of the full debt. The preference for the judgment creditor may send the debtor over the brink. Other creditors willing to tolerate a new general creditor (with a deferred claim, as theirs probably will be deferred) may not tolerate a super-secured creditor with a claim to immediate payment. The ensuing scramble to realize on the debtor’s assets may make everyone worse off. The supercedeas bond is not supposed to elevate the judgment creditor over other creditors at the expense of these costs.
So the district judge has a very difficult task — to make the judgment creditor as well off during the appeal as it would be if it could execute at once, but no better off. When the judgment debtor lacks the assets or credit necessary to pay at once and in full, this means that the judge should give the creditor less than complete security. There should be a strong preference for a partial bond in the amount of the value of the claim. See Trans World Airlines, Inc. v. Hughes, 314 F.Supp. 94 (S.D.N.Y.1970) ($75 million bond to secure a judgment of $145 million), aff’d in relevant part, 515 F.2d 173 (2d Cir.1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1147 (1976); cf. International Telemeter Corp. v. Hamlin International Corp., 754 F.2d 1492, 1495 (9th Cir.1985). How much less? Without holding a lengthy Hearing — without conducting the same sort of proceedings that would be appropriate in bankruptcy — the judge cannot find out how much the judgment creditor’s claim is worth, and so the judge cannot set a bond with confidence. The plain *801 tiffs in this case seek a full hearing at which they can determine how much their claim is worth and how much the security Western Union Telegraph has offered is worth. But this hearing would be so complex, and of so little value in relation to the gains from a little extra precision, that I agree with the majority’s (implicit) conclusion that none was necessary.
This does not mean, however, that the district judge is free to pick any old security and tell the judgment creditor to be satisfied. The judge’s best guess is still likely to be a shot in the dark. The valuation of claims, and of security for claims, is a difficult process. There are specialists in valuation — they work for banks and bonding companies. The principal attraction of at least a partial bond is that the need to secure such a bond subjects the assets and claims of the judgment creditor to scrutiny and' to monitoring. These specialists have the benefits of expertise and ready access to information; they also have the spur of self interest. The costs of failure concentrate the mind. Judges and lawyers have no similar interest at stake in a hearing to determine the value of proposed collateral.
Western Union Telegraph asserts that the security it has posted with the district court will assure payment to the plaintiffs. The district court cannot easily verify this claim. A bank or bonding company would do better. If Western Union Telegraph is correct about the value of its security, it should be able to get at least a partial bond, secured with the same cash, accounts, and equipment it has posted in the district court. The institution posting this security will monitor Western Union Telegraph closely to ensure that it does not make itself unable to pay. Far better to have the valuation and monitoring functions performed by specialists than to have them performed by a district judge. This cuts strongly in favor of a partial bond.
Western Union Telegraph and the majority give different reasons for accepting the security that has already been provided. Western Union Telegraph asserts that a bond or any other form of security would interfere with pending plans of reorganization. This is unlikely. The firm undertaking to provide security has no reason to interfere with any reorganization that will be beneficial to the Western Union group of firms; the gains of a reorganization would improve the security of its position. True, the Western Union firms might need to get the assent of the bank or other guarantor, but the monitoring this would elicit is a benefit rather than a detriment.
Western Union Telegraph' also asserts that no one is willing to give the security plaintiffs seek. This, too, is unlikely. It maintains that the cash and security interests it has provided to the district court— $10 million in cash, a security interest in $10 million of accounts receivable, and security interests in more than $80 million of real property, microwave equipment, and satellite transponders — is more than enough to make the plaintiffs secure on the full $36 million judgment. If it will make the plaintiffs secure, it will make a bank or other guarantor secure, too. The affidavit from Western Union’s chief financial officer states that the 31 banks that have lent large sums to Western Union declined to issue a letter of credit in plaintiffs’ favor, but the affidavit omits any mention of (a) the price Western Union Telegraph offered to pay for the letter of credit, and (b) the security it offered to give. Rational banks respond to such things; the affidavit does not assert, and the district court did not find, that the banks would not issue a letter of credit for the right price. Too, the affidavit does not say that Western Union Telegraph approached any bank outside its regular consortium of lenders. The banks in the consortium may be leery of giving the plaintiffs security at the expense of themselves; outside banks would have no similar scruple. The fact that Western Union Telegraph did not approach outside banks, and did not offer to compensate the banks it did approach, suggests that there are pretty good possibilities if Western Union Telegraph is told it must be serious about the subject.
*802 The last argument from Western Union Telegraph is that a third party does not want to guarantee the obligation because “that creditor would then have the risks that plaintiffs are trying to shed” (emphasis in original). Exactly so — and exactly why Western Union Telegraph is wrong. Banks are in the business of taking risks for a price. To get a letter of credit, Western Union Telegraph would have to pay the person who assumed the risk. The payment would depend on the size of the risk (which depends in turn on what is going to happen to Western Union, on the duration of the appellate process, and on the probability that the judgment will be affirmed), on the steps that could be taken to reduce the risk, on the expertise banks bring to bear in liquidating security if something should go wrong, and on the banks' ability to hedge against the risk by diversifying. Banks and other third-party creditors have diversified portfolios of loans and financial instruments; diversification reduces the price they charge for risk-bearing services. The plaintiffs do not have similarly diversified portfolios of antitrust judgments. Risk is more costly for the plaintiffs than it is for banks. The plaintiffs (unlike banks) are not experts in realizing on security. Finally, Western Union Telegraph has not offered to compensate plaintiffs for bearing risk. Doubtless Western Union Telegraph wants plaintiffs to bear, for free, risk it would have to pay a bank to assume. But this is an argument in favor of a bond or other security, not an argument against it. The payment to the risk-bearer would be borne ratably by those with current interests in Western Union Telegraph, and the result would put plaintiffs on a par with these (other) creditors, as they should be. Letting plaintiffs bear the risks themselves, without compensation, transfers wealth from the plaintiffs to the other creditors.
The majority’s principal concern, by contrast, seems to be that a requirement of a bond will catapult the corporate family into bankruptcy. This is a curious fear, on two counts. First, Western Union Telegraph does not say that a bond or letter of credit will precipitate bankruptcy; the defendant’s insistence that it has (and has posted) plenty of collateral cuts the other way. Second, there is no reason to treat bankruptcy as a bogeyman, as a fate worse than death — even, as the majority does, as a “penalty” for violation of the antitrust laws. No evidence of which I am aware demonstrates that the bankruptcy process is particularly costly. True, there are high costs, including the costs of trustees and lawyers and the costs of judicial error. But the costs of reorganization come from the-financial distress of the firm, not from the judicial process through which that distress is worked out.
It is difficult and costly to reorganize a firm and rearrange claims against that firm; each creditor will strive to engross a larger portion of the available assets. The Western Union group of firms is incurring these costs now, without a filing in bankruptcy. The function of the judicial bankruptcy process is to prevent costly asset-grabbing and to assure equal treatment of creditors of the same class. See Boston & Maine Corp. v. Chicago Pacific Corp., 785 F.2d 562, 565-66 (7th Cir.1986). The bankruptcy process (or the threat of it) probably reduces rather than increases the cost of a financial restructuring. See Thomas H. Jackson, Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors’ Bargain, 91 Yale L.J. 857 (1982). There is ground to doubt that a restructuring under judicial auspices, rather than a sale to a third party for cash, is the best way to handle the bankruptcy process, see Douglas G. Baird, The Uneasy Case for Corporate Reorganizations, 15 J. Legal Studies 127 (1986), but there is little reason to think that entering the bankruptcy process generally is inferior to private restructuring in the shadow of bankruptcy law. The alarums in the majority opinion — pale versions of the alarums in Texaco, Inc. v. Pennzoil Co., 784 F.2d 1133, 1152 (2d Cir.1986), which equated a Chapter 11 filing with the imminent dismissal of 55,000 employees and the destruction of the valuable assets of a firm — are unjustified. Firms in *803 reorganization go on as before; all operations with positive values are maintained; operations that are not continued in bankruptcy should not be continued outside it, either. The principal effect of the judicial process is to stave off asset-grabbing and to ensure that creditors of the same level of priority are treated alike. This is, of course, just what the plaintiffs want — to receive the same treatment as Western Union Telegraph’s other general creditors, who may get paid off while plaintiffs cool their heels in the appellate process.
The majority’s related contention that a corporation has been punished enough for violating the antitrust laws if the stockholders are wiped out — that this “is the greatest punishment that can be visited on a corporation” — is unsupportable. The corporation is not a person amenable to punishment. All punishments inflicted on a corporation in name are collected from investors in fact. The threat of punishment induces these investors to monitor the managers’ conduct more carefully, and any realized punishment reduces the managers’ future responsibility and income. Creditors as well as equity investors are potential monitors, and the threat of injury to creditors’ position induces them to take extra care. Creditors are especially good monitors when a firm has ’ been on the brink for some years (as Western Union has), and the creditors therefore have much to gain or lose from the firm’s choices. Western Union’s creditors have more than $300 million in short-term loans on the line, which tends to make them watchful. The award of damages in an antitrust case therefore can and should come at the expense of creditors, once equity investors have been wiped out. Damages, to be sufficient, must induce the firm to take account-of the full costs its acts impose on others, multiplied because of the chance that wrongful acts will escape detection or punishment. William M. Landes, Optimal Sanctions for Antitrust Violations, 50 U.Chi.L.Rev. 652 (1983). This penalty must be imposed even if a firm falls on hard times; anything less produces too little deterrence. Worse, if a firm cannot be punished past the point of obliterating the equity claimants, then a firm already bankrupt would be free to violate the antitrust laws with impunity. I doubt that the majority means to grant Manville, Continental Airlines, and (perhaps) Western Union this dispensation.
I am willing to join the judgment only for the last reason the majority gives, that the district court is better able to supervise this case than are we. The judgment was entered on November 12, 1985, and since then plaintiffs have had only the security ordered by the district court. For all my carping about the procedure used to produce and supervise this security, it appears to be ample. The plaintiffs’ principal fear is that the impending restructuring of the Western Union group of corporations will remove assets from Western Union Telegraph and put them elsewhere. That must be prevented, and today’s ruling, which effectively requires the entire family of firms to stand behind the judgment as a price of proceeding with financial restructuring free from the interference of the plaintiffs, stills plaintiffs’ principal concern. Our decision to accelerate the oral argument on the merits to May 5 reduces the period during which the plaintiffs are at risk. All told, the existing security, our court’s amendment to it, and the acceleration of our consideration give the judgment debtors as much security as they are likely to get if we were to remand for further hearings and for the imposition of a partial bond. That it is now too late to do much for these plaintiffs does not mean that district courts should follow tomorrow the path this case has taken. I hope they will not.