786 F.2d 794
 54 USLW 2546, 1986-1 Trade Cases 67,005,
4 Fed.R.Serv.3d 708
 OLYMPIA EQUIPMENT LEASING COMPANY, Alfco Telecommunications
Company, and Abraham Feldman, Plaintiffs-Appellants,
v.
WESTERN UNION TELEGRAPH COMPANY, Defendant-Appellee.
 No. 85-3154.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 4, 1986.
Decided March 13, 1986.
Amended March 25, 1986.
 
 Stephen J. Spitz, Sperling, Slater & Spitz, Chicago, Ill., for plaintiffs-appellants.
 Andrew Hartzell, Jr., Debevoise & Plimpton, New York City, for defendant-appellee.
 Before BAUER, POSNER, and EASTERBROOK, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 The plaintiffs ("Olympia" for short) obtained a $36 million antitrust judgment (after trebling) against Western Union Telegraph Company, the principal subsidiary of Western Union Company. Western Union Telegraph wanted a stay of execution of judgment pending appeal to this court, and ordinarily to get a stay it would have had to post a supersedeas bond for the full amount of the judgment. Fed.R.Civ.P. 62(d). It urged the district judge to allow alternative security, on the ground that it could not post a $36 million bond. Although Western Union Telegraph is a large company, with total assets nominally worth $2 billion, it is financially distressed and illiquid. It could get a bond only by persuading a bank to issue a letter of credit to the bonding company, and it contended that no bank would do this. The district judge allowed alternative security to be posted, consisting of a pledge of $10 million in cash, $10 million in accounts receivables, and a security interest, which Western Union Telegraph represented to be worth about $70 million, in some of the company's physical assets. Olympia has appealed the judge's order (a classic "collateral order," appealable separately from the final judgment on the merits, see, e.g., Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); Redding & Co. v. Russwine Construction Corp., 417 F.2d 721, 724-26 (D.C.Cir.1969)), contending that the posting of a supersedeas bond is mandatory and in the alternative that the alternative security required by the district judge is inadequate.
 
 
 2
 Although a textual argument can be made that Rule 62(d) makes the posting of a supersedeas bond mandatory, so that if a bond is not posted the judgment creditor can begin to execute the judgment immediately even though an appeal is pending, we agree with the contrary conclusion in Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n, 636 F.2d 755, 757-60 (D.C.Cir.1980). (The dictum in Donovan v. Fall River Foundry Co., 696 F.2d 524, 526 (7th Cir.1982), on which the plaintiffs rely, is not inconsistent with Federal Prescription Service. We merely said that posting a bond entitles the appellant to a stay of execution pending appeal; that is of course what Rule 62(d) says; if he does not post a bond, he risks the district judge's deciding to deny a stay.) To the technical reasons which that court advanced for rejecting a literal reading of Rule 62(d) we add that an inflexible requirement of a bond would be inappropriate in two sorts of case: where the defendant's ability to pay the judgment is so plain that the cost of the bond would be a waste of money; and--the opposite case, one of increasing importance in an age of titanic damage judgments--where the requirement would put the defendant's other creditors in undue jeopardy. Federal Prescription Service was the former sort of case; this case, as we shall see, is the latter sort. Either is a candidate for alternative security, as recognized in Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc., 600 F.2d 1189, 1191 (5th Cir.1979).
 
 
 3
 The hard questions raised by this appeal are whether a supersedeas bond was in fact unobtainable and whether the alternative security approved by the district judge is adequate. It is reasonably clear that a bond could not have been obtained without a letter of credit, but as to whether any bank would have issued such a letter we have only the evidence that no member of Western Union Telegraph's 31-bank lending consortium would do so. Maybe another bank would have done so. Since, however, the members of the consortium are the banks that know the company best, their refusal may be probative of how other banks would act. Sometimes, it is true, a bank will make a loan that the borrower's established lenders consider too risky. The bank hopes to get into the borrower's good graces and perhaps win his future business. But Olympia does not argue that this was a realistic possibility here. Public regulation makes banks behave as if risk averse and perhaps Western Union Telegraph is too shaky to make banks that are unfamiliar with its business eager to lend to it.
 
 
 4
 A more serious problem is that Western Union Telegraph based its inquiry about obtaining a letter of credit on the premise that it would not have to pay more than the standard fee, which (we surmise) is 1 percent of the face amount of the letter of credit; if it had offered a higher fee it might have generated greater interest on the part of prospective issuers. But as Olympia makes nothing of this point, neither shall we; and maybe if Western Union Telegraph had offered a higher fee this would have been taken as an acknowledgment of unusual hazards, and have frightened away potential issuers. At some level of course the fee would break the company.
 
 
 5
 If as we shall assume Western Union Telegraph could not have obtained a letter of credit on reasonable terms, the alternatives facing the district judge were either to allow Olympia to execute the judgment by seizing and selling unencumbered assets of Western Union Telegraph, or to allow the posting of alternative security. The propriety of the second course is implicit in our conclusion that Rule 62(d) does not impose an ironclad requirement of a supersedeas bond, and makes the issue one of the adequacy of the alternative security that the district judge allowed the defendant to post. On that issue we note first that the parties and the district judge made little effort to explore the possibility of a bond that would secure a part of Olympia's judgment--perhaps the $12 million in compensatory damages. The punitive damages in the award are a windfall to Olympia, their purpose (their principal purpose, anyway) being to punish and deter antitrust violators rather than to compensate the victims. The element of windfall mitigates our concern that if Western Union Telegraph declared bankruptcy, Olympia might never collect a penny of the punitive damages, even if there were some money for other creditors. And well it might not, for there is authority for disallowing claims of punitive damages in bankruptcy where necessary to allow other creditors to be paid in full (a qualification stressed in In re American Federation of Television & Radio Artists, 32 B.R. 672, 674 (Bankr.S.D.N.Y.1983)). The idea is that to allow a claim for punitive damages in these circumstances would make innocent creditors bear the burden of the debtor's wrongdoing. See In re GAC Corp., 681 F.2d 1295, 1301 (11th Cir.1982); In re Colin, 44 B.R. 806, 810 (Bankr.S.D.N.Y.1984).
 
 
 6
 We need not decide whether this is a sound analysis. It is enought that the loss of Olympia's claim for punitive damages, if that were a consequence of Western Union Telegraph's declaring bankruptcy, would not so impair the deterrent effects of antitrust liability that we should require that the district judge use superhuman efforts to secure this part of Olympia's antitrust judgment no matter what the costs to the other creditors of Western Union Telegraph. For, speaking realistically, bankruptcy would be punishment enough for the company's violation of the antitrust laws, if it did violate them, even if as a result of bankruptcy the award of punitive damages were wiped off the books. Sometimes, it is true, a corporation emerges from bankruptcy with all creditors paid and something left over for the shareholders. But this is rare, and, more important, would be a case where the punitive damages or some portion of them could be paid without impairing the interests of other creditors; so there would be no danger of the shareholders' escaping any part of the judgment. If the punitive damages were not collectible it would mean that the shareholders' equity had been completely wiped out; and that is the greatest punishment that can be visited on a corporation. It is not realistic to imagine that creditors will take effective steps to prevent their borrower from violating the antitrust laws (or other laws for the violation of which punitive damages can be awarded), knowing that they may have to bear the burden of an award of punitive damages should they fail to do so. It would be different if the creditors (more realistically, a committee of the principal lenders) controlled the company at the time of the alleged violations, but Olympia makes no such argument. And even then, any increment in deterrence from trying to sock the creditors with an award of punitive damages would have to be traded off against the deadweight losses of bankruptcy. Of course if the creditors came to own the company, as they might in a reorganization in bankruptcy, they would be liable to the extent of the value of their investment for any future antitrust violations by the company.
 
 
 7
 A more serious problem with the alternative security is that the district judge has allowed Western Union Telegraph Company to make cash transfers to its parent, Western Union Company, even though the parent is probably not liable on the judgment. A parent corporation, like an individual shareholder, ordinarily is not liable for the debts of a subsidiary beyond the parent's investment in the subsidiary. It has the same protection of limited liability that an individual shareholder would have; whether the conditions for "piercing the corporate veil" might be satisfied here we need not consider. The cash transfers of which Olympia complains may be necessary to enable Western Union to keep its lenders from calling their loans. If they did call them, the whole Western Union enterprise might collapse, including the defendant subsidiary. This is not certain. The stock of Western Union Telegraph is an asset of its parent, and can be reached by the parent's creditors, who might therefore come to own the subsidiary, but this would not entitle them to levy on the subsidiary's assets. In re Manville Forest Products Corp., 31 B.R. 991, 994 (S.D.N.Y.1983). All this is a little too pure, though; solvent subsidiaries often get sucked into the parent's bankruptcy, as in the Manville case just cited. See also Blumberg, The Law of Corporate Groups Sec. 13.03 (1985). But even though allowing the cash transfers to be made may therefore benefit the subsidiary as well as the parent, it is not clear to us why the judgment should not follow the assets of the subsidiary when they are transferred to the parent.
 
 
 8
 Except for the failure to make the judgment do this, our reservations about the district judge's order are not of such gravity as would warrant our setting the order aside. The judgment he had to make was discretionary--equitable--judgmental--in a strong sense which limits the scope of appellate review. He had to balance the interest of Olympia as a judgment creditor against the interest of the other creditors of Western Union Telegraph who might be harmed if Olympia were allowed to execute its judgment or tie up more of the defendant's assets. If, as Olympia requests, all of Western Union Telegraph's unencumbered assets were made over to Olympia as security for its judgment, the position of Western Union Telegraph's unsecured creditors, including banks to which it owes in excess of $300 million, would become perilous. A judgment creditor is a bona fide creditor, but the court that issues the judgment is not required to ignore the interests of other creditors when deciding how much security to make the defendant post as a condition of being allowed to stave off execution of the judgment pending appeal. This becomes apparent when we consider the contingent nature of such a creditor's claim if an appeal is filed, as in this case. If the judgment is reversed, the claim is invalidated ab initio. Of course other creditors' claims may be contingent too; nevertheless it would be a painful irony for us to impair and perhaps even destroy the other creditors' claims merely to remove every element of hazard from a claim that may not survive the process of appeal.
 
 
 9
 While the district judge might have pressed Western Union a bit harder than he did to come up with additional liquid assets to pledge to Olympia, he did not so far exceed the reasonable bounds of judgment as to require us to intervene--with one exception, made urgent by events since he issued his order. Western Union has announced the sale, effective April 30, of a division of Western Union Telegraph for $155 million in cash. Olympia would like us to forbid the transfer of any of this cash to the parent, so that it can remain as an asset of the subsidiary to satisfy the judgment against it. We decline to do this. The parent is shaky, too (its shaky subsidiary is its principal asset). It needs the cash from the sale of the division to pay off some of its bank debt. But as we said earlier, the judgment should follow the assets. We herewith modify the district judge's order so that it forbids Western Union Telegraph to make any cash transfer, whether in the form of dividends or otherwise, to its parent, unless it obtains Western Union's agreement to be bound on the antitrust judgment to the extent of any cash transferred, or posts a supersedeas bond (or, what Olympia concedes would be the equivalent, pledges a letter of credit) securing the entire judgment.
 
 
 10
 We shall also accelerate the date of oral argument of the appeal on the merits in order to minimize the period of jeopardy for Olympia's judgment. And, needless to say, Olympia is free at any time to ask the district judge to modify the security order in light of changed circumstances. (We were told at argument that Western Union would announce a major financial restructuring in about two weeks.) But we reject any suggestion that the district judge and we should be indifferent to the possible consequences of a literal interpretation of Rule 62(d). Olympia is not Western Union Telegraph's only creditor, and given that its status as creditor is conditional on its prevailing in the appeal from the antitrust judgment we cannot criticize the district judge for his unwillingness to risk throwing Western Union Telegraph into bankruptcy merely to increase (maybe) the probability that Olympia can collect all of its judgment if the judgment is affirmed. Apart from the impact that a declaration of bankruptcy might have on other creditors of Western Union Telegraph, there are the considerable deadweight losses which bankruptcy creates. See studies cited in American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589, 597 (7th Cir.1986). The bigger the bankruptcy--and a bankruptcy of Western Union Telegraph would be one of the biggest--the bigger those costs. Of course the financial restructuring of Western Union that is in progress as we write may impose similar costs; and as bankruptcy is a legally authorized method of sorting out the claims of competing creditors, there is an argument for allowing Olympia to perfect its claim and take its chances, in bankruptcy, with the other creditors, if that is what Olympia wants to do. But we are reluctant to conclude that a district judge commits an abuse of discretion by refusing to allow a plaintiff to execute a judgment in circumstances where the execution may cause a billion-dollar bankruptcy, merely because the alternative security to a supersedeas bond that the defendant apparently cannot post provides a slightly inferior protection of the plaintiff's interest.
 
 
 11
 Especially are we reluctant to so conclude in circumstances where allowing the plaintiff to execute his judgment before the defendant could appeal might not even increase the probability of the plaintiff's collecting the judgment in full. Depending on what assets were seized the attempt at execution might so interfere with Western Union Telegraph's business or so jeopardize the collectibility of other creditors' claims as to throw the company into bankruptcy, at which point Olympia would be just a judgment creditor. A judgment creditor is an unsecured creditor; and though a federal court's judgment can of course give rise to a lien, see 28 U.S.C. Sec. 1962; 4 Collier on Bankruptcy p 547.12 at p. 547-51 n. 21 (15th ed., King, 1985), and a lien creditor has priority over unsecured and some secured creditors, see UCC Secs. 9-301(1)(b), (3), there is no suggestion that Olympia has obtained or can obtain a lien by virtue of the judgment in this case. Unsecured creditors usually fare poorly in bankruptcies. Maybe, then, this is all a big game of "chicken" in which Olympia's object is to force a settlement before the appeal is heard by making it difficult for Western Union Telegraph to prosecute the appeal without declaring bankruptcy, even though Olympia knows that if Western Union Telegraph does not flinch, and declares bankruptcy, Olympia's claim may prove to be uncollectible. All this is speculation but that is all the more reason for not disturbing the district judge's exercise of discretion beyond the modest extent that we have indicated.
 
 
 12
 MODIFIED AND, AS MODIFIED, AFFIRMED.
 
 
 13
 EASTERBROOK, Circuit Judge, concurring.
 
 
 14
 A judgment creditor holds a general, unsecured debt. It is different from other unsecured debt only to the extent the judgment creditor also has a right to immediate execution. The function of a supercedeas bond is to protect the judgment creditor's position from erosion during any period that its right to execute is obstructed by a stay pending appeal--erosion that could occur if the creditor's financial position takes a turn for the worse or the creditor puts assets beyond the debtor's reach. It is an important safeguard. Often it takes many years to get a judgment (this suit was filed in 1977 and concerns acts from still earlier years); during the suit the judgment creditor's claim may slip behind the claims of other creditors. The deliberate speed of the law ought not to cause still further erosion in the creditor's position.
 
 
 15
 If on the day of judgment the creditor has the liquid assets to pay in full, or the ability to borrow enough to pay, then the bond does nothing except assure the prevailing party that it will recover no less after the appeal is over. Things get sticky when the defendant cannot pay in full, or at once, because of financial difficulties.
 
 
 16
 On the one hand it seems this is just the case for which the bond is designed--the financial distress of the debtor puts the judgment creditor in peril if it waits for the appeal to take its course. The defendant may fail, leaving other creditors to collect while the judgment creditor is stymied; or the debtor may "reorganize" in a way that puts assets beyond the judgment creditor's reach.
 
 
 17
 On the other hand a bond or irrevocable letter of credit prefers the judgment creditor over other creditors. The bond assures the judgment creditor of payment in full. It puts the assets of a solvent bank or bonding company behind the obligation, while other creditors must look to the assets of the debtor; the guarantor of the judgment will take security in the debtor's assets, which causes the position of other creditors to deteriorate. The bond does not preserve the judgment creditor's position; it improves the position, perhaps dramatically. If on the day of judgment the debt was worth 50 cents on the dollar, the judgment creditor should be made secure to this extent but to this extent only. Anything else is a preference over other creditors. Yet the bond or letter of credit will assure payment of the full debt. The preference for the judgment creditor may send the debtor over the brink. Other creditors willing to tolerate a new general creditor (with a deferred claim, as theirs probably will be deferred) may not tolerate a super-secured creditor with a claim to immediate payment. The ensuing scramble to realize on the debtor's assets may make everyone worse off. The supercedeas bond is not supposed to elevate the judgment creditor over other creditors at the expense of these costs.
 
 
 18
 So the district judge has a very difficult task--to make the judgment creditor as well off during the appeal as it would be if it could execute at once, but no better off. When the judgment debtor lacks the assets or credit necessary to pay at once and in full, this means that the judge should give the creditor less than complete security. There should be a strong preference for a partial bond in the amount of the value of the claim. See Trans World Airlines, Inc. v. Hughes, 314 F.Supp. 94 (S.D.N.Y.1970) ($75 million bond to secure a judgment of $145 million), aff'd in relevant part, 515 F.2d 173 (2d Cir.1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1147 (1976); cf. International Telemeter Corp. v. Hamlin International Corp., 754 F.2d 1492, 1495 (9th Cir.1985). How much less? Without holding a lengthy hearing--without conducting the same sort of proceedings that would be appropriate in bankruptcy--the judge cannot find out how much the judgment creditor's claim is worth, and so the judge cannot set a bond with confidence. The plaintiffs in this case seek a full hearing at which they can determine how much their claim is worth and how much the security Western Union Telegraph has offered is worth. But this hearing would be so complex, and of so little value in relation to the gains from a little extra precision, that I agree with the majority's (implicit) conclusion that none was necessary.
 
 
 19
 This does not mean, however, that the district judge is free to pick any old security and tell the judgment creditor to be satisfied. The judge's best guess is still likely to be a shot in the dark. The valuation of claims, and of security for claims, is a difficult process. There are specialists in valuation--they work for banks and bonding companies. The principal attraction of at least a partial bond is that the need to secure such a bond subjects the assets and claims of the judgment creditor to scrutiny and to monitoring. These specialists have the benefits of expertise and ready access to information; they also have the spur of self interest. The costs of failure concentrate the mind. Judges and lawyers have no similar interest at stake in a hearing to determine the value of proposed collateral.
 
 
 20
 Western Union Telegraph asserts that the security it has posted with the district court will assure payment to the plaintiffs. The district court cannot easily verify this claim. A bank or bonding company would do better. If Western Union Telegraph is correct about the value of its security, it should be able to get at least a partial bond, secured with the same cash, accounts, and equipment it has posted in the district court. The institution posting this security will monitor Western Union Telegraph closely to ensure that it does not make itself unable to pay. Far better to have the valuation and monitoring functions performed by specialists than to have them performed by a district judge. This cuts strongly in favor of a partial bond.
 
 
 21
 Western Union Telegraph and the majority give different reasons for accepting the security that has already been provided. Western Union Telegraph asserts that a bond or any other form of security would interfere with pending plans of reorganization. This is unlikely. The firm undertaking to provide security has no reason to interfere with any reorganization that will be beneficial to the Western Union group of firms; the gains of a reorganization would improve the security of its position. True, the Western Union firms might need to get the assent of the bank or other guarantor, but the monitoring this would elicit is a benefit rather than a detriment.
 
 
 22
 Western Union Telegraph also asserts that no one is willing to give the security plaintiffs seek. This, too, is unlikely. It maintains that the cash and security interests it has provided to the district court--$10 million in cash, a security interest in $10 million of accounts receivable, and security interests in more than $80 million of real property, microwave equipment, and satellite transponders--is more than enough to make the plaintiffs secure on the full $36 million judgment. If it will make the plaintiffs secure, it will make a bank or other guarantor secure, too. The affidavit from Western Union's chief financial officer states that the 31 banks that have lent large sums to Western Union declined to issue a letter of credit in plaintiffs' favor, but the affidavit omits any mention of (a) the price Western Union Telegraph offered to pay for the letter of credit, and (b) the security it offered to give. Rational banks respond to such things; the affidavit does not assert, and the district court did not find, that the banks would not issue a letter of credit for the right price. Too, the affidavit does not say that Western Union Telegraph approached any bank outside its regular consortium of lenders. The banks in the consortium may be leery of giving the plaintiffs security at the expense of themselves; outside banks would have no similar scruple. The fact that Western Union Telegraph did not approach outside banks, and did not offer to compensate the banks it did approach, suggests that there are pretty good possibilities if Western Union Telegraph is told it must be serious about the subject.
 
 
 23
 The last argument from Western Union Telegraph is that a third party does not want to guarantee the obligation because "that creditor would then have the risks that plaintiffs are trying to shed" (emphasis in original). Exactly so--and exactly why Western Union Telegraph is wrong. Banks are in the business of taking risks for a price. To get a letter of credit, Western Union Telegraph would have to pay the person who assumed the risk. The payment would depend on the size of the risk (which depends in turn on what is going to happen to Western Union, on the duration of the appellate process, and on the probability that the judgment will be affirmed), on the steps that could be taken to reduce the risk, on the expertise banks bring to bear in liquidating security if something should go wrong, and on the banks' ability to hedge against the risk by diversifying. Banks and other third-party creditors have diversified portfolios of loans and financial instruments; diversification reduces the price they charge for risk-bearing services. The plaintiffs do not have similarly diversified portfolios of antitrust judgments. Risk is more costly for the plaintiffs than it is for banks. The plaintiffs (unlike banks) are not experts in realizing on security. Finally, Western Union Telegraph has not offered to compensate plaintiffs for bearing risk. Doubtless Western Union Telegraph wants plaintiffs to bear, for free, risk it would have to pay a bank to assume. But this is an argument in favor of a bond or other security, not an argument against it. The payment to the riskbearer would be borne ratably by those with current interests in Western Union Telegraph, and the result would put plaintiffs on a par with these (other) creditors, as they should be. Letting plaintiffs bear the risks themselves, without compensation, transfers wealth from the plaintiffs to the other creditors.
 
 
 24
 The majority's principal concern, by contrast, seems to be that a requirement of a bond will catapult the corporate family into bankruptcy. This is a curious fear, on two counts. First, Western Union Telegraph does not say that a bond or letter of credit will precipitate bankruptcy; the defendant's insistence that it has (and has posted) plenty of collateral cuts the other way. Second, there is no reason to treat bankruptcy as a bogeyman, as a fate worse than death--even, as the majority does, as a "penalty" for violation of the antitrust laws. No evidence of which I am aware demonstrates that the bankruptcy process is particularly costly. True, there are high costs, including the costs of trustees and lawyers and the costs of judicial error. But the costs of reorganization come from the financial distress of the firm, not from the judicial process through which that distress is worked out.
 
 
 25
 It is difficult and costly to reorganize a firm and rearrange claims against that firm; each creditor will strive to engross a larger portion of the available assets. The Western Union group of firms is incurring these costs now, without a filing in bankruptcy. The function of the judicial bankruptcy process is to prevent costly asset-grabbing and to assure equal treatment of creditors of the same class. See Boston & Maine Corp. v. Chicago Pacific Corp., 785 F.2d 562, 565-566 (7th Cir.1986). The bankruptcy process (or the threat of it) probably reduces rather than increases the cost of a financial restructuring. See Thomas H. Jackson, Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain, 91 Yale L.J. 857 (1982). There is ground to doubt that a restructuring under judicial auspices, rather than a sale to a third party for cash, is the best way to handle the bankruptcy process, see Douglas G. Baird, The Uneasy Case for Corporate Reorganizations, 15 J. Legal Studies 127 (1986), but there is little reason to think that entering the bankruptcy process generally is inferior to private restructuring in the shadow of bankruptcy law. The alarums in the majority opinion--pale versions of the alarums in Texaco, Inc. v. Pennzoil Co., 784 F.2d 1133,1152 (2d Cir.1986), which equated a Chapter 11 filing with the imminent dismissal of 55,000 employees and the destruction of the valuable assets of a firm--are unjustified. Firms in reorganization go on as before; all operations with positive values are maintained; operations that are not continued in bankruptcy should not be continued outside it, either. The principal effect of the judicial process is to stave off asset-grabbing and to ensure that creditors of the same level of priority are treated alike. This is, of course, just what the plaintiffs want--to receive the same treatment as Western Union Telegraph's other general creditors, who may get paid off while plaintiffs cool their heels in the appellate process.
 
 
 26
 The majority's related contention that a corporation has been punished enough for violating the antitrust laws if the stockholders are wiped out--that this "is the greatest punishment that can be visited on a corporation"--is unsupportable. The corporation is not a person amenable to punishment. All punishments inflicted on a corporation in name are collected from investors in fact. The threat of punishment induces these investors to monitor the managers' conduct more carefully, and any realized punishment reduces the managers' future responsibility and income. Creditors as well as equity investors are potential monitors, and the threat of injury to creditors' position induces them to take extra care. Creditors are especially good monitors when a firm has been on the brink for some years (as Western Union has), and the creditors therefore have much to gain or lose from the firm's choices. Western Union's creditors have more than $300 million in short-term loans on the line, which tends to make them watchful. The award of damages in an antitrust case therefore can and should come at the expense of creditors, once equity investors have been wiped out. Damages, to be sufficient, must induce the firm to take account of the full costs its acts impose on others, multiplied because of the chance that wrongful acts will escape detection or punishment. William M. Landes, Optimal Sanctions for Antitrust Violations, 50 U.Chi.L.Rev. 652 (1983). This penalty must be imposed even if a firm falls on hard times; anything less produces too little deterrence. Worse, if a firm cannot be punished past the point of obliterating the equity claimants, then a firm already bankrupt would be free to violate the antitrust laws with impunity. I doubt that the majority means to grant Manville, Continental Airlines, and (perhaps) Western Union this dispensation.
 
 
 27
 I am willing to join the judgment only for the last reason the majority gives, that the district court is better able to supervise this case than are we. The judgment was entered on November 12, 1985, and since then plaintiffs have had only the security ordered by the district court. For all my carping about the procedure used to produce and supervise this security, it appears to be ample. The plaintiffs' principal fear is that the impending restructuring of the Western Union group of corporations will remove assets from Western Union Telegraph and put them elsewhere. That must be prevented, and today's ruling, which effectively requires the entire family of firms to stand behind the judgment as a price of proceeding with financial restructuring free from the interference of the plaintiffs, stills plaintiffs' principal concern. Our decision to accelerate the oral argument on the merits to May 5 reduces the period during which the plaintiffs are at risk. All told, the existing security, our court's amendment to it, and the acceleration of our consideration give the judgment debtors as much security as they are likely to get if we were to remand for further hearings and for the imposition of a partial bond. That it is now too late to do much for these plaintiffs does not mean that district courts should follow tomorrow the path this case has taken. I hope they will not.