Order filed September 8, 2005









Order
filed September 8, 2005.                                       

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-04-00433-CV

____________

 

RAMCO
OIL & GAS, LTD. and RAMCO ENERGY PLC, Appellants/Cross-Appellees

 

V.

 

ANGLO
DUTCH (TENGE) L.L.C. and ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC., Appellees/Cross-Appellants

 



 

On Appeal from the 61st District
Court

Harris County, Texas

Trial Court Cause No. 00-22588

 



 

O R D E R








Appellants/cross-appellees Ramco Oil & Gas, Ltd. (ARamco Oil@) and
Ramco Energy PLC (ARamco Energy@) have
filed a motion under Rule 24.4(a) of the Texas Rules of Appellate Procedure
seeking appellate review of what they allege is an excessive amount of security
required by the trial court to supersede the judgment from which they appeal in
this case.  For the reasons stated
herein, we require that the amount of bond, deposit, or other security
necessary to supersede the trial court=s
judgment be decreased as set forth below. To this extent, we grant in part the
Rule 24.4(a) motion filed by Ramco Oil and Ramco Energy (hereinafter
collectively referred to as the AJudgment
Debtors@); otherwise, we deny this motion. We grant the emergency motion to lift
this court=s stay of execution on the trial
court=s judgment, filed by appellees/cross-appellants Anglo-Dutch (Tenge) L.L.C.
and Anglo-Dutch Petroleum International, Inc. (hereinafter collectively
referred to as the AJudgment Creditors@).

                              I. 
Factual and Procedural Background

On April 1, 2004, the trial court signed an amended judgment against
the Judgment Debtors and in favor of the Judgment Creditors.  The Judgment Debtors are appealing this
judgment, in which they have been held jointly and severally liable for $6.4
million in damages and jointly and severally liable with Halliburton Energy
Services, Inc., for $9.8 million in attorney=s fees
as well as all costs of court. 

Eight months after the trial court signed the amended
judgment, the Judgment Debtors filed a motion asking the trial court to lower
the amount of the bond needed to supersede this judgment to $200,000 and
asserting that posting a bond in excess of this amount would cause the Judgment
Debtors substantial economic harm.  See Tex.
Civ. Prac. & Rem. Code Ann. 52.006(c) (Vernon Supp. 2004) (stating
that, on a showing by the judgment debtor that the judgment debtor is likely to
suffer substantial economic harm if required to post security in an amount
required under section 52.006(b), the trial court shall lower the amount of the
security to an amount that will not cause the judgment debtor substantial
economic harm); Tex. R. App. P. 24.2(b)
(stating that the trial court must lower the amount of security required by
Rule 24.2(a) to an amount that will not cause the judgment debtor substantial
economic harm if, after notice to all parties and a hearing, the court finds
that posting a bond, deposit, or security in the amount required by Rule
24.2(a) is likely to cause the judgment debtor substantial economic harm).








After allowing discovery concerning the Judgment
Debtors= net worth, the trial court heard
the Judgment Debtors= motion on April 29, 2005.  At the conclusion of that evidentiary
hearing, the trial court signed an order setting the amount of bond, deposit,
or security required to supersede the judgment (hereinafter ASecurity Amount@) at $7.505 million, which the
court determined was 50 percent of ARamco=s@ 2003 net worth in U.S. Dollars.  See Tex.
Civ. Prac. & Rem. Code Ann. 52.006(b) (Vernon Supp. 2004) (stating
that, notwithstanding any other law or rule of court, the Security Amount for a
money judgment must not exceed the lesser of (1) 50 percent of the judgment
debtor=s net worth, or (2) $25 million); Tex. R. App. P. 24.2(a)(1) (stating
that, for a money judgment, the Security Amount must not exceed the lesser of
(a) 50 percent of the judgment debtor=s current net worth or (b) $25 million).  In this order, the trial court also suspended
enforcement of its April 1, 2004 judgment pending appellate review of the
proper Security Amount.  See Tex. R. App. P. 24.4.  

Days after the April 29 order, the Judgment Debtors
filed in this court an emergency motion to review the order setting the
Security Amount at $7.505 million.  See
Tex. Civ. Prac. & Rem. Code Ann. 52.006(d)
(Vernon Supp. 2004); Tex. R. App. P. 24.4.  The Judgment Debtors asked this court to
lower the Security Amount to $200,000. 
The Judgment Debtors also requested this court to issue a temporary
order staying execution on the judgment pending this court=s resolution of the motion to
review the Security Amount.  See Tex. R. App. P. 24.4(c).  This court granted this relief and stayed
execution on the judgment pending our decision on the motion.  See id.  








On June 24, 2005, the Judgment Creditors filed an
emergency motion to lift this court=s temporary stay based on the alleged threat that the
Judgment Debtors would dissipate their assets. 
The Judgment Creditors also cited a change in the Judgment Debtors= financial condition since April
29, 2005.  On June 28, 2005, this court
ordered this case abated and remanded to the trial court for the taking of
evidence and the entry of findings of fact. 
See Tex. R. App. P. 24.4(d).  Specifically, we ordered the trial court to
conduct a hearing and make findings of fact and conclusions of law concerning
the changes in circumstances, if any, concerning the Judgment Debtors= net worth.  See Tex.
R. App. P. 24.3(a)(2) (trial court may modify amount of security if
circumstances change); Tex. R. App. P. 24.4(b)
(review of the sufficiency or excessiveness of the amount of security may be
based both on conditions as they existed at the time of the trial court=s order and on changes in those
conditions).  In this order, we stated
that the trial court must lower the Security Amount to an amount that will not
cause the Judgment Debtors substantial economic harm if the court finds that
posting the required bond is likely to cause substantial economic harm.  Tex.
R. App. P. 24.2(b).  Furthermore,
we instructed the trial court that, when the trial court determines a judgment
debtor=s net worth for purposes of setting
a Security Amount, the court must state with particularity the factual basis
for its determination of the debtor=s net worth.  Tex. R. App. P. 24.2(c)(3).  

On July 21, 2005, the trial court conducted a
hearing under this court=s abatement order.  After hearing evidence and the argument of
counsel, the trial court issued findings of fact and conclusions of law
stating, among other things, the following:

!       The Judgment Debtors= financial condition has improved
since the trial court set the Security Amount on April 29, 2005.  

!       AThe net worth of Ramco,@ based on its market
capitalization, is $20 million.

!       Although a net worth of $20
million would ordinarily require a reduction in the Security Amount to $10
million, the trial court  left the
Security Amount needed to supersede the judgment at $7.505 million because the
Judgment Creditors agreed that this amount was sufficient. 

!       Posting a $7.505 million
supersedeas bond will not cause ARamco@ substantial economic harm. 

!       Changes in circumstances do
not warrant a modification of the Security Amount set in the trial court=s April 29, 2005 order.

 

II.  Standards of Review








We review the alleged excessiveness of the trial court=s determination of the amount of security under Rule
24.4 of the Texas Rules of Appellate Procedure using an abuse-of-discretion
standard.  See In re Kajima Intern., Inc., 139 S.W.3d 107, 112 (Tex. App.CCorpus Christi 2004, orig.
proceeding).  Likewise, we review the Asubstantial economic harm@ determination under this
standard.  See Isern v. Ninth Court of
Appeals, 925 S.W.2d 604, 606 (Tex. 1996) (stating that trial court had
discretion to allow alternate security under former Texas Rule of Appellate
Procedure 47 and section 52.002 of the Texas Civil Practice and Remedies
Code).   Generally, the test for abuse of
discretion is whether the trial court acted without reference to any guiding
rules and principles or whether the trial court acted arbitrarily and unreasonably.  See McDaniel v. Yarbrough, 898 S.W.2d
251, 253 (Tex. 1995).  However, a trial
court has no discretion in determining what the law is and applying the law to
the facts.  See Gonzalez v. Reliant
Energy, Inc., 159 S.W.3d 615, 623B24 (Tex. 2005).  A
failure by the trial court to analyze or apply the law correctly is an abuse of
discretion.  Id.

Furthermore, under section 52.006,
the trial court=s discretion is limited by the
requirement that the Security Amount cannot exceed the limit set forth in
section 52.006(b) or an amount that is likely to cause the judgment debtor
substantial economic harm.  See Tex. Civ. Prac. & Rem. Code Ann. 52.006(b),
(c);  Bocquet v. Herring, 972
S.W.2d 19, 20B21 (Tex.1998).  Therefore, the trial court abuses its
discretion if the evidence is legally or factually insufficient to support its
findings under section 52.006(b) or (c). 
See Bocquet, 972 S.W.2d at 20‑21; Bass v. Walker, 99
S.W.3d 877, 883 (Tex. App.CHouston [14 Dist.] 2003, pet. denied) (although court
reviews sanctions under abuse-of-discretion standard, if there is legal or
factually insufficient evidence to support the trial court=s fact finding under the relevant
legal standard, then the trial court abused its discretion);  Hunt v. Baldwin, 68 S.W.3d 117, 135 n.
8 (Tex. App.CHouston [14th Dist.] 2001, no pet.).       








As to the net-worth determination
and the determination of whether the Judgment Debtors are likely to suffer
substantial economic harm, the Judgment Debtors have the burden of proof.  See Tex.
Civ. Prac. & Rem. Code Ann. 52.006(c); Tex. R. App. P. 24.2(c)(3). 
Therefore, for the Judgment Debtors to show that the trial court abused
its discretion as to these issues by ruling based on legally insufficient
evidence, the Judgment Debtors must demonstrate that the evidence conclusively
establishes, as a matter of law, all vital facts in support of their position.  See Dow Chemical Co. v. Francis, 46
S.W.3d 237, 241 (Tex. 2001).  In making
this determination, we must consider evidence in the light most favorable to
the challenged finding and indulge every reasonable inference that would
support it. City of Keller v. Wilson, __ S.W.3d __, __, No. 02-1012,
2005 WL 1366509, at *10 (Tex. June 10, 2005). 
We must credit favorable evidence if a reasonable factfinder could and
disregard contrary evidence unless a reasonable factfinder could not.  See id., __ S.W.3d at __, 2005
WL 1366509, at *14.  We must determine
whether the evidence before the trial court would enable reasonable and
fair-minded people to find the facts at issue. 
See id.  The factfinder is
the sole judge of the credibility of the witnesses and the weight to give their
testimony.  See id., __
S.W.3d at __, 2005 WL 1366509, at *8. 

In determining whether the Judgment
Debtors have shown that the trial court abused its discretion as to these
issues by ruling based on factually insufficient evidence, we examine the entire record, considering both the
evidence in favor of, and contrary to, the challenged finding.  Cain v. Bain, 709 S.W.2d 175, 176
(Tex. 1986).  After considering and
weighing all the evidence, we set aside the fact finding only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.  Pool v. Ford Motor Co.,
715 S.W.2d 629, 635 (Tex. 1986). The trier of fact is the sole judge of the
credibility of the witnesses and the weight to be given to their
testimony.  GTE Mobilnet of S. Tex. v.
Pascouet, 61 S.W.3d 599, 615B16 (Tex.
App.CHouston [14th Dist.] 2001, pet. denied).  We may not substitute our own judgment for
that of the trier of fact, even if we would reach a different answer on the
evidence.  Maritime Overseas Corp. v.
Ellis, 971 S.W.2d 402, 407 (Tex. 1998).          

III.  Analysis

The issues at hand involve the
recently amended section 52.006 of the Texas Civil Practice and Remedies Code
and the recently amended Rule 24 of the Texas Rules of Appellate
Procedure.  No opinions or published
orders appear to have addressed these issues.

No Differentiation Between Judgment
Debtors








Under section 52.006(b) of the
Texas Civil Practice and Remedies Code, the cap on appellate security for money
judgments is based on Athe judgment debtor=s net worth.@  Tex. Civ. Prac. & Rem. Code Ann. 52.006(b).  Therefore, the amount of security required of
each jointly and severally liable defendant may be different.  See id.; Elaine A. Carlson, Reshuffling
the Deck: Enforcing and Superseding Civil Judgments on Appeal After House Bill
4, 46 S. Tex. L. Rev. 1035,
1072 (2005).  The trial court set the
amount of supersedeas at $7.505 million without differentiating between the two
Judgment Debtors.   

Ramco Oil

The trial court did not determine
the net worth of Ramco Oil.  The
affidavit of the Judgment Debtors= group financial director, Steven Bertram, states that
Ramco Oil is currently insolvent.  The
Judgment Creditors offered no contrary evidence.  The affidavits of Bertram and Christopher G.
Moar, Ramco Energy=s Vice President of Finance, state
that Ramco Oil=s net assets are 440 pounds
sterling.[1]  The audited financial statements of Ramco
Energy for 2003 and 2004 were admitted in evidence before the trial court. They
show that Ramco Oil is one of various subsidiaries of Ramco Energy.  At his deposition, Bertram testified that
Ramco Oil sold its interest in an oil and gas field for approximately 67
million pounds and that in 2003, Ramco Energy decided to use these profits to
develop its interest in the Seven Heads gas field offshore Ireland.  Bertram testified that, to this end, during
2003 Ramco Oil distributed substantially all of its assets to Ramco Energy by
dividend.  Moar testified at the July
2005 hearing that Ramco Oil=s net assets had not changed in the past year.  There is no evidence to the contrary in our
record.  








Bertram and Moar are interested
witnesses. Testimony from interested witnesses may establish a fact as a matter
of law only if the testimony could be readily contradicted if untrue, and is
clear, direct, and positive, and there are no circumstances tending to
discredit or impeach it.  See Lofton
v. Texas Brine Corp., 777 S.W.2d 384, 386 (Tex. 1989); see also City of
Keller v. Wilson, __ S.W.3d __, __, No. 02-1012, 2004 WL 1366509, at *9
(Tex. June 10, 2005) (stating that the factfinder cannot ignore undisputed
testimony that is clear, positive, direct, otherwise credible, free from
contradictions and inconsistencies, and could have been readily
controverted).  The record reflects that
the parties conducted net-worth discovery, including interrogatories, document
production, and at least one deposition, that of Bertram.  The Judgment Debtors produced various
documents, including audited financial statements for 2003 and 2004 and various
unaudited financial statements.  We
conclude that the testimony of Moar and Bertram as to the net worth of Ramco
Oil could be readily contradicted if untrue. 
The evidence that Ramco Oil=s current net worth is 440 pounds is clear, direct, and
positive.  There are no circumstances
tending to discredit or impeach this evidence. 
Reviewing the evidence under the applicable standard of review, we
conclude that the evidence conclusively proves as a matter of law that the net
worth of Ramco Oil is 440 pounds.  Therefore,
the trial court abused its discretion in determining that the proper Security
Amount for Ramco Oil is $7.505 million.  See
Tex. Civ. Prac. & Rem. Code Ann. 52.006(b);
Tex. R. App. P. 24.2(a)(1).  Using the same 1.7 dollar-to-pound exchange
rate used by the Judgment Creditors and the trial court, Ramco Oil=s net worth is $748, and 50 percent
of this amount is $374.[2]  Therefore, the trial court erred in not
setting the Security Amount for Ramco Oil at $374.  See Tex.
Civ. Prac. & Rem. Code Ann. 52.006(b); Tex. R. App. P. 24.2(a)(1).  

                                                     Ramco
Energy

In its findings of fact and conclusions of law, the
trial court based its determination that Ramco Energy=s net worth is $20 million on Ramco Energy=s market capitalization.  For reasons explained below, the trial court
erred as a matter of law in using market capitalization as its measure of net
worth.

                                                        Net
Worth








Ramco Energy is a Scottish public
limited company.  Moar testified at the
July 2005 hearing that the net worth of Ramco Energy, as of December 31, 2004,
was 6.2 million pounds based on the company=s annual
report and audited financial statement[3]
prepared by PricewaterhouseCoopers
LLP.  The court admitted in evidence an
unaudited financial statement for Ramco Energy showing it had a net worth of
approximately 5.2 million pounds as of May 31, 2005. The note on this financial
statement indicated, and Moar testified, that based on the company=s issuance of new share capital,
its net worth had since increased by one million pounds, bringing the company=s net worth as of the date of the
hearing (July 21, 2005) to 6.2 million pounds. The Judgment Creditors= expert witness, Walter Bratic,
took no exception to this audited financial statement and acknowledged that the
net worth listed in the financial statement was the Anet worth on a book basis, using
generally accepted accounting principles.@  Thus, it was
undisputed at the July 21 hearing that the net worth of Ramco Energy based on
this definition of net worth was 6.2 million pounds.   

Nonetheless, Bratic, the Judgment Creditors= expert, testified that, in his opinion the net worth
of the company is about $20 million, Abased on
what the investing public says this company is worth.@  Bratic used
market capitalization as his sole basis for determining Ramco Energy=s net worth. 
Neither section 52.006(b) of the Texas Civil Practice and Remedies Code
nor the part of Rule 24 that implements it contain a definition of Anet worth.@ 

We review the trial court=s interpretation of applicable statutes de novo.  See  Johnson v. City
of Fort Worth, 774
S.W.2d 653, 655B56 (Tex. 1989).  In construing a statute, our objective is to
determine and give effect to the Legislature=s intent.  See Nat=l Liab. & Fire Ins. Co. v.
Allen, 15 S.W.3d
525, 527 (Tex. 2000).  If possible, we
must ascertain that intent from the language the Legislature used in the
statute and not look to extraneous matters for an intent the statute does not
state.  Id.  If the meaning of the statutory language is
unambiguous, we adopt the interpretation supported by the plain meaning of the
provision=s words.  St. Luke=s Episcopal Hosp. v. Agbor, 952 S.W.2d 503, 505 (Tex.
1997).  We must not engage in forced or
strained construction; instead, we must yield to the plain sense of the words
the Legislature chose.  See id. 








ANet worth@ is a term used by laymen as well
as professionals.  Although it is a term
of art in business and accounting, its meaning is the same in ordinary
usage.  Dictionaries define Anet worth@ as the amount by which resources
exceed liabilities to creditors.  See,
e.g., Webster=s Third
New International Dictionary 1519 (defining Anet assets@ as Athe excess of value of resources
over liabilities to creditors@) & 1520 (defining Anet worth@ as a synonym of Anet assets@) (1993 ed.); see also Encarta World English Dictionary (defining Anet worth@ as Aassets minus liabilities: the
difference between assets and liabilities of a person or company.@);
Investopedia (2000 ed.) (defining Anet worth@ as Athe amount by which a company or
individual=s assets exceed their liabilities@). 
Law dictionaries assign the term the same meaning. See Black=s Law
Dictionary 1639 (8th
ed. 2004) (stating that Anet worth@ is usually calculated as excess of
total assets over total liabilities); Black=s Law
Dictionary 939 (5th
ed. 1979) (defining Anet worth@ as the A[r]emainder after deduction of
liabilities from assets@); 
Merriam-Webster=s
Dictionary of Law
(1996 ed.) (defining Anet worth@ as Athe excess of the value of assets
over liabilities@). 
Likewise, many courts considering the meaning of this term also have
adopted this widely accepted definition. 


For example, in holding that the
plain meaning of Anet worth@ in the Equal Access to Justice Act
is the difference between total assets and total liabilities determined in
accordance with generally accepted accounting principles (AGAAP@), the United States Court of
Appeals for the Seventh Circuit made the following observations:

Congress did not
define the statutory term Anet worth.@  It seems a fair guess that if it had thought
about the question, it would have wanted the courts to refer to generally
accepted accounting principles.  What
other guideline could there be?  Congress
would not have wanted us to create a whole new set of accounting principles
just for use in cases under the Equal Access to Justice Act.  The proceeding to recover attorney=s fees under the Act is intended to be summary; it is
not intended to duplicate in complexity a public utility commission=s rate of return proceeding.  

 








Continental Web Press, Inc. v. NLRB, 767 F.2d 321, 323 (7th Cir.
1985), disapproved of on other grounds by, Comm=r, INS v. Jean, 496 U. S. 154, 160B66, 110 S. Ct. 2316, 2319B23, 110 L. Ed.2d 134 (1990).  Several federal courts of appeals also have
held that the unambiguous meaning of Anet worth@ in federal statutes is the difference between total assets
and total liabilities determined in accordance with GAAP.  See, e.g., Broaddus v. United States Army
Corps of Eng=rs, 380 F.3d 162, 166B67 (4th Cir. 2004) (holding that
unambiguous meaning of Anet worth@ under Equal Access to Justice Act
is total assets less total liabilities according to GAAP); Sanders v.
Jackson, 209 F.3d 998, 999B1002 (7th Cir. 2000) (holding that plain meaning of Anet worth@ under Fair Debt Collection
Practices Act is total assets less total liabilities according to GAAP, which
is balance-sheet or book net worth); Kuhns v. United States, 930 F.2d
39, 41B42 (D.C. Cir. 1991) (holding that Anet worth@ under Equal Access to Justice Act
must be calculated in accordance with GAAP); see also Castelli v. Toliba,
83 N.Y.S.2d 554, 564 (Sup. Ct. 1948) (stating that Anet worth@ has a well-defined meaning, which
is the remainder after the deduction of liabilities from assets).  Furthermore, in a federal case, the trial
court allowed the judgment debtors to supersede a judgment in excess of $145
million by posting a $75 million bond and by making an initial and subsequent
certifications that the net worth of one of the judgment debtors was in excess
of three times the amount of the judgment. 
Trans World Airlines, Inc. v. Hughes, 314 F. Supp. 94, 97B98 (S.D.N.Y. 1970).  In that case, the trial court required the
certification of the net worth of the judgment debtor in question to be in
accordance with GAAP.  See id. at
97.  The plain meaning of Anet worth,@ as used in section 52.006 of the
Texas Civil Practice and Remedies Code and Rule 24, is the difference between
total assets and total liabilities determined in accordance with GAAP.

Neither the Judgment Creditors nor
their expert have identified any treatise or other authority to support the
notion that a company=s net worth is measured by market
capitalization, yet the trial court equated market capitalization with net
worth.  Market capitalization and net
worth are not the same thing. Market capitalization, often referred to as Amarket cap,@ is the sum derived from the
current stock price per share times the total number of shares outstanding.  Investopedia (2000 ed.).  It reflects the overall value of a company=s stock and may be higher or lower
than the company=s net worth.  Although market capitalization is an
indication of the value of a company, our lawmakers chose net worthCnot market capitalizationCas the legal standard in section
52.006 of the Texas Civil Practice and Remedies Code.  We must defer to the Legislature=s selection of net worth as the
applicable standard. Using this measure C the difference between total assets and total liabilities
determined in accordance with GAAP C not only comports with the unambiguous terms of the
statute, but also makes more sense in the context of assessing a judgment
debtor=s ability to post bond or other
security.  By using market capitalization
as the standard for determining Ramco Energy=s net worth, the trial court applied an incorrect legal
standard and erred as a matter of law.  See
Gonzalez, 159 S.W.3d at 623B24.

The Judgment Creditors assert that
the following two sentences from the legislative history of section 52.006
reveal a legislative intent to leave to the trial court the definition and
determination of the Afluid concept@ of net worth in any given case:








There is no easy way to define Anet worth,@ and it
is important to give judges discretion to determine this on a case-by-case
basis.  If a plaintiff feels that a
defendant is manipulating its assets to reduce the bond amount, the plaintiff
can ask the judge to address this.

House Res.
Bill Org., Bill Analysis,
H.B. 4, 78th Leg., R.S., p. 46 (2003). 
We disagree with the Judgment Creditors= argument in this regard.  Although trial courts have discretion under
section 52.006 to determine the amount of a judgment debtor=s net worth, they have no
discretion to alter the meaning of the term Anet worth.@  This statute does
not make a trial court=s determination final, rather it
subjects that determination to review by appellate courts.  See Tex.
Civ. Prac. & Rem. Code Ann. 52.006(d); In re Kajima Intern.,
139 S.W.3d at 112.  Section 52.006 also
limits the trial court=s factfinding in this regard to a
determination of A50 percent of the judgment debtor=s net worth.@ See Tex. Civ. Prac. & Rem. Code Ann. 52.006(b)(1).  The Legislature could have required the trial
court to determine the Security Amount based on 50 percent of a judgment debtor=s value, using whatever measure of
value the trial court found to be most appropriate.  However, the Legislature did not do so;  instead, it required that the trial court
base this determination on the judgment debtor=s Anet worth.@ 
While determining Anet worth@ under GAAP may be quite
complicated and may involve different considerations based on the circumstances
of the judgment debtor and based on GAAP, the unambiguous meaning of this term
is the difference between total assets and total liabilities determined in
accordance with GAAP.








We do not interpret the
above-quoted legislative history to be contrary to the plain meaning of section
52.006.  In any event, even if the
legislative history stated that the trial court has unbridled discretion to
determine the judgment debtor=s net worth or that Anet worth@ has no fixed meaning or definition whatsoever, we would
not be able to give effect to this legislative history because it would
contradict the unambiguous language of the statute.  See Fleming Foods of Texas, Inc. v.
Rylander, 6 S.W.3d 278, 283B84 (Tex. 1999) (holding that, although section 311.023 of
the Texas Government Code states that courts may consider the legislative
history of unambiguous statutes, the legislative history of a statute cannot be
used to alter the unambiguous meaning of a statute, except for the rare
instance in which it is used to show a typographical error);  St. Luke=s Episcopal Hosp., 952 S.W.2d at 505 (stating that
courts need not resort to extrinsic aids in construing an unambiguous statute
and that courts must find the legislature=s intent as expressed in the language of the statute).       The
Judgment Creditors also cite Justice Gonzalez=s
concurring opinion in Wal-Mart
Stores, Inc. v. Alexander.  See 868 S.W.2d 322, 329B32 (Tex. 1993) (Gonzalez, J.,
concurring). In this concurring opinion, Justice Gonzalez lamented the Texas
Supreme Court=s failure to follow his suggestion
in Lunsford v. Morris that the court define what Anet worth@ means in the context of the
admission into evidence of a defendant=s net worth for the purpose of determining what, if any,
punitive damages should be assessed against that defendant.  See id. at 330B31; Lunsford v. Morris, 746
S.W.2d 471, 472B73 (Tex. 1988) (changing Texas
common law and holding for the first time in Texas that evidence regarding a
party=s Anet worth@ is discoverable and admissible in evidence
if punitive damages are sought against that party); id., at 475
(Gonzalez, J., dissenting) (warning that practitioners will be confused because
the majority does not define what Anet worth@ means and what types of evidence will be admissible to
show Anet worth@). 
Although Justice Gonzalez cites various cases as evidence of confusion
among the courts of appeals as to the meaning of net worth in this context, the
cases cited either deal with the scope of discovery regarding a defendant=s net worth or recite the types of
evidence of net worth that were admitted at trial, without discussing the
propriety of admitting that kind of evidence. 
See Alexander, 868 S.W.2d at 330 (citing cases as evidence of
confusion regarding the meaning of net worth). 








In his concurring opinion in Alexander,
Justice Gonzalez does not cite any cases that determine the definition of Anet worth@ under the common-law requirement
established by Lunsford.  See
id.  Justice Gonzalez stated that,
although it was not necessary to decide the matter in the case at hand, the
court should have stated that gross sales are not admissible to prove net worth
regarding this requirement but that evidence is admissible regarding net income
and assets minus liabilities.  See id.
at 330B31. 
Justice Gonzalez stated that A[a] rule which limits admissibility only to assets minus
liabilities may exclude relevant evidence and impede the goal of determining
the true wealth of a defendant.@  See id. at
331.  Although there was some
disagreement among courts of appeals as to what matters fell within the scope
of discovery as to this common-law issue of the net worth of a defendant
against whom punitive damages are sought,
the Texas Supreme Court never followed Justice Gonzalez=s recommendation that it address the issue of the
definition of Anet worth@ in this
context.  The parties have not cited, and
we have not found, any cases addressing the definition of Anet worth@ under
this common-law requirement.

In 1995, the Texas Legislature
enacted a statute stating that, A[i]n determining the amount of exemplary damages, the trier
of fact shall consider evidence, if any, relating to  . . . the net worth of the defendant.@ Act of April 11, 1995, 74th Leg.,
R.S., ch. 19, ' 1, sec. 41.011, 1995 Tex. Gen.
Laws 108, 112 (codified at Tex. Civ.
Prac. & Rem. Code Ann. ' 41.011 (Vernon 1997)). 
The parties have not cited, and we have not found, any cases examining
the meaning of Anet worth@ under section 41.011 of the Texas
Civil Practice and Remedies Code.  See  Tex.
Civ. Prac. & Rem. Code Ann. ' 41.011.  Because
this statute uses the phrase Aevidence . . . relating to . . . the net worth of the
defendant,@ there may be less reason to go
into the definition of Anet worth@ under this statute.  Section 52.006(b), by contrast, uses the
precise language A50 percent of the judgment debtor=s net worth.@ 
Tex. Civ. Prac. & Rem. Code
Ann. ' 52.006(b).  In sum, Justice Gonzalez=s concurring opinion in Alexander
does not change our analysis in this case.

Reviewing the evidence under the
applicable standard of review and applying the plain meaning of the term Anet worth,@ we conclude that the evidence
conclusively proves as a matter of law that the current net worth of Ramco
Energy is 6.2 million pounds.  Counsel
for the Judgment Creditors agreed at the July 2005 hearing that this amount is
equivalent to $10.54 million, and the trial court so agreed in its findings of
fact.  Fifty percent of this amount is
$5.27 million, and thus, the proper Security Amount for Ramco Energy under Rule
24.2(a)(1) is $5.27 million.  The trial
court abused its discretion in reaching its conclusion that the proper Security
Amount required for Ramco Energy to supersede the judgment is $7.505
million.  See Gonzalez, 159 S.W.3d
at 623B24.

Substantial Economic Harm

The term Asubstantial economic harm@ is not defined by the
statute.  It is clear, however, that it
is something less than Airreparable harm,@ the legal standard utilized before
the recent statutory amendment.  Though
there is not yet case law construing the term, one noted scholar has observed: 








The recent legislative
modifications to supersedeas requirements effective as to cases in which a
final judgment is signed on or after September 1, 2003, reflect a shift in
concern from that of protecting the judgment creditor=s ability to collect the judgment
if affirmed on appeal, to protecting the judgment debtor from substantial
economic harm by appellate security requirements that may effectively preclude
the ability to seek appellate review.

 

Carlson, 46 S. Tex. L. Rev. at 1093.

 

In amending section 52.006, the
Legislature struck a new balance between a judgment creditor=s interest in protecting its
judgment pending appeal and a judgment debtor=s interest in having the ability to
challenge the adverse judgment on appeal. 
Not only does the statute replace the Airreparable harm@ standard for reducing security
with Asubstantial economic harm,@ it also eliminates the requirement
that the judgment debtor show harm Awill@ occur; now the evidence need only
demonstrate that harm is Alikely.@ 
Moreover, the statute no longer requires the judgment debtor to
demonstrate that allowing lesser security will not substantially decrease the
degree to which a judgment creditor=s recovery would be secured, in order to obtain relief from
the statutory Security Amount.   See Tex. Civ. Prac. & Rem. Code Ann. '' 52.002, 52.006 (Vernon 1997).  This means the court need not consider how
any reduction of the Security Amount might affect the judgment creditor=s ability to recover under the
judgment. 








The thrust of the inquiry under
section 52.006(c) is whether the judgment debtor has the ability to meet the
supersedeas requirement as determined in 52.006(a) or (b) and whether doing so
is likely to result in substantial economic harm.  See Tex.
Civ. Prac. & Rem. Code Ann. 52.006. 
In conducting this analysis, the trial court has the flexibility to take
into account a number of factors that could affect the judgment debtor=s ability to post bond or other
security based on the facts and circumstances specific to the case.  This inquiry, however, should not focus on
the market capitalization of the company or its value as a whole but on the
judgment debtor=s actual ability to post the
security required.  In other words, the
court should be less concerned with what price the company might fetch in the
marketplace if sold today and more concerned with the company=s available resources and its
ability to use them to post security.  How
much cash or other resources would it take to post a supersedeas bond in the
amount in question? Does the judgment debtor have sufficient cash or other
assets on hand to post a supersedeas bond in this amount or to post a deposit
in lieu of bond in this amount?   Does
the judgment debtor have any other source of funds available?  Does the judgment debtor have the ability to
borrow funds to post the requisite security? 
Does the judgment debtor have unencumbered assets to sell or pledge?  What economic impact is such a transaction
likely to have on the judgment debtor? 
Would requiring the judgment debtor to take certain action likely
trigger liquidation or bankruptcy or have other harmful consequences?  These are the sort of inquiries that tend to
reveal whether a judgment debtor is likely to suffer substantial economic harm.
Given the new statutory framework, the drain on the judgment debtor=s resources caused by the attorney=s fees and other costs of appealing
the judgment could also be a legitimate factor to consider in determining
whether the judgment debtor is likely to suffer substantial economic harm.

The trial court found that posting
a supersedeas bond in the amount of $7.505 million will not cause substantial
economic harm to Ramco Energy.  We
presume that the trial court also found that posting a bond, deposit, or
security in the amount of $5.27 million will not likely cause substantial
economic harm to Ramco Energy.  The
Judgment Debtors presented some evidence that, if the trial court found it
credible and reliable, might have been sufficient to support a finding by the
trial court that Ramco Energy is likely to suffer substantial economic harm if
required to post security in the amount of $5.27 million.  Nonetheless, the issue is whether the trial
court abused its discretion because the Judgment Debtors conclusively proved
this issue as a matter of law or because the trial court=s contrary finding is so against to the overwhelming weight of the evidence
as to be clearly wrong and unjust.








Both in their affidavits and in
their hearing testimony, Bertram and Moar testified that posting security in an
amount greater than $200,000 would cause Ramco Energy substantial economic
harm.  The Judgment Creditors= only witness, Bratic, did not
controvert this testimony.[4]  Therefore, this testimony from the Judgment
Debtors= witnesses was uncontroverted.  However, this does not necessarily mean that
the Judgment Debtors conclusively proved substantial economic harm as a matter
of law.  See Lofton, 777 S.W.2d at
386 (stating that testimony from interested witnesses may establish a fact as a
matter of law only if the testimony could be readily contradicted if untrue,
and is clear, direct, and positive, and there are no circumstances tending to discredit
or impeach it); see also City of Keller v. Wilson, __ S.W.3d __, __, No.
02-1012, 2004 WL 1366509, at *9 (Tex. June 10, 2005).  Without detailing all of the evidence
supporting Ramco Energy=s arguments in favor of substantial
economic harm, we note the following:

!       Ramco
Energy introduced no evidence of any efforts on their part to obtain a
supersedeas bond or of what the premium, other costs, and required collateral,
if any, would be to obtain a supersedeas bond in the amount of $7.505 million
or in any other amount.  A surety on a
supersedeas bond may choose to require the judgment debtor/principal on the
bond to post 100 percent security for its obligations under the supersedeas
bond; however, sureties are not required to do so.  Bertram and Moar seem to presume without
explanation that 100 percent security would be required.  They state in their affidavits that Ramco
Energy has only $200,000 available to post supersedeas and then they later
testify that Ramco Energy can only post a supersedeas bond in the amount of
$200,000.  Ramco Energy has introduced no
evidence to show, under current market conditions, the highest amount of a supersedeas
bond it could obtain with $200,000.  

 

!       Bertram
and Moar concluded that posting more than a $200,000 supersedeas bond would
cause Ramco Energy substantial economic harm. 
However, they did not conduct an analysis of the maximum Security Amount
that Ramco Energy could post without being likely to suffer substantial
economic harm and then determine that this amount was $200,000.  Rather, Bertram testified that this $200,000
figure is based on the amount of money that was frozen in Ramco Energy=s accounts at the Bank of Scotland
by the arrestment and inhibition[5] that the Judgment
Creditors obtained in November 2004, in the Court of Session at Edinburgh,
Scotland. Ramco Energy has not explained why the amount of funds that happened
to be frozen in its accounts with the Bank of Scotland correlates with the
maximum Security Amount that will not be likely to cause it substantial
economic harm.  There was testimony that
the arrestment and inhibition would not apply to any funds that Ramco might
deposit with the Bank of Scotland after the date the arrestment and inhibition
went into effect.

 








!       In
their affidavits, Moar and Bertram testified that Ramco Energy owns the office
building in which its headquarters are located in Aberdeen, Scotland and that
this building is unencumbered.  During
his hearing testimony, Bertram noted that this building was subject to the
arrestment and inhibition obtained by the Judgment Creditors; however, the
Judgment Creditors= counsel noted in the trial court
that the Judgment Creditors are willing to lift the arrestment and inhibition
to the extent that Ramco Energy would use the covered assets to supersede the
judgment.  (Indeed, the $200,000 that
Ramco Energy proposes to use to supersede the judgment is covered by the
arrestment and inhibition.)  Moar
testified at the July 2005 hearing that Ramco Energy purchased this office
building in 2000 for approximately 1.4 million pounds and that he did not know
the current value of that building because he is not a property valuation
expert.[6]
The trial court could have based its ruling in part on the availability of this
unencumbered office building with a book value of approximately $2.38 million.[7]  Ramco Energy offered no evidence as to how
much money it could borrow by pledging its title to this building.  Ramco Energy did not offer evidence as to the
amount of supersedeas bond a surety would agree to sign if Ramco Energy pledged
this building as collateral.  

 








!       Ramco
Energy has seven unencumbered interests in oil and gas properties that have no proven
reserves C five in Ireland, one in
Montenegro, and one in Bulgaria.  By the
July 2005 hearing, there was evidence that Ramco Energy had entered into
farmout arrangements as to two of these interests.  Further, Bertram and Moar testified that
Ramco Energy cannot obtain loans on interests that have no proven
reserves.  However, there was no
testimony as to whether these interests could be sold to generate funds to post
security.  Regarding this possibility,
Bertram testified at the April 2005 hearing that he was Anot sure how easy that would be to
do or how quickly that could be done.@  At the July 2005
hearing, Moar was asked, AIs it possible to raise any money
in connection with an asset like that [an unproven asset]?@ 
Moar responded, AI don=t believe so.@ 
Moar, however, also testified that he is not qualified to value oil and
gas assets.  The Judgment Debtors did not
conclusively prove that these seven properties cannot be sold to generate funds
to post security.[1]

 

!         Although
Ramco Energy emphasized its outstanding debt of approximately 75 million pounds
to the Bank of Scotland relating to the Seven Heads gas field, the evidence
shows that all but 12 million pounds of this debt is nonrecourse debt that is
secured only by the 86.5 percent interest of the Ramco group in this gas field.  Although 12 million pounds is secured by the
stock of Ramco Energy=s profitable oil services subsidiary, Ramco Energy did
not introduce evidence that this subsidiary could not service this 12 million
pounds obligation or that it was not worth 12 million pounds. 

 

!         In Ramco
Energy=s 2004 annual report, its Executive Chairman informs
the shareholders that A[t]he objective is to be debt free by the end of 2005.
. . .@

 

!         Ramco
Energy=s 2004 audited financial statement shows that in 2004,
its four executives received an aggregate salary of 1.095 million pounds or
$1.861 million.  The same statement also
shows that these four executives received a total compensation in 2004 of 1.39
million pounds or $2.363 million.  

In light of the above considerations, we conclude that
the testimony of interested witnesses Bertram and Moar does not satisfy the Lofton
standard for conclusive evidence.  Accordingly, the
testimony of these witnesses did not conclusively prove that Ramco Energy will
likely suffer substantial economic harm if it is required to post security in
an amount greater than $200,000.  See
Lofton, 777 S.W.2d at 386; see also City of Keller, __ S.W.3d at __,
2004 WL 1366509, at *9.  Under the
applicable standard of review, we determine that there is legally and factually
sufficient evidence to support the trial court=s implied finding that Ramco Energy
is not likely to suffer substantial economic harm if required to post $5.27
million in security.  On this record, the
trial court did not abuse its discretion in impliedly making this
determination.  








IV.  Conclusion

The trial court abused its
discretion in determining the proper Security Amount as to both Ramco Oil and
Ramco Energy.  Specifically, the trial
court erred in equating  net worth with
market capitalization.  The plain meaning
of Anet worth,@ as used in section 52.006 of the
Texas Civil Practice and Remedies Code and Rule 24, is the difference between
total assets and total liabilities determined in accordance with GAAP.  Under this plain meaning, the evidence
conclusively proves that the net worth of Ramco Energy is $10.54 million (6.2
million pounds) and the net worth of Ramco Oil is $748 (440 pounds).  Therefore, the trial court abused its
discretion in not determining that the cap under section 52.006(b) is $5.27
million for Ramco Energy and $374 for Ramco Oil.

On this record and under the
applicable standard of review, the trial court did not abuse its discretion in
impliedly finding that Ramco Energy is not likely to suffer substantial
economic harm if required to post $5.27 million in security. To date, Ramco Oil
has not asserted that it is likely to suffer substantial economic harm if
required to post $374 in security; however, in the unlikely event Ramco Oil
wishes to do so, it is free to file a Rule 24.2(b) motion in the trial court.








Accordingly, we require that the
amount of bond, deposit, or other security necessary to supersede the trial
court=s judgment be DECREASED to
$374 for Ramco Oil and  DECREASED
to $5,270,000 for Ramco Energy.  To this extent, we GRANT IN PART the
Judgment Debtors= Rule 24.4(a) motion; otherwise, we DENY this motion. We GRANT
the Judgment Creditors= emergency motion to lift this court=s stay of execution on the judgment
in its favor.  It is therefore ORDERED
that this court=s May 10, 2005 order staying
execution against Ramco Oil & Gas, Ltd., and Ramco Energy PLC on the
Amended Final Judgment signed April 1, 2004, in trial court cause number
2000-22588 in the 61st District Court of Harris County, styled Anglo-Dutch
(Tenge) L.L.C. and Anglo Dutch Petroleum International, Inc. v. Ramco Oil &
Gas, Ltd., Ramco Energy PLC, Golden Eagle Partners S.a.r.i., Golden Eagle
Partnership, L.C., Central Asian Investments, N.V., Halliburton Energy
Services, Inc., Bruce Kososki and Fred Tresca is vacated and this STAY IS LIFTED.
We note however that
the trial court=s April 29, 2005 order suspended
enforcement of the trial court=s judgment pending completion of appellate review under
Rule 24.4.  Today=s order does not affect this
suspension of enforcement by the trial court.

 

 

 

 

 

/s/      Kem
Thompson Frost

Justice

 

 

Order filed
September 8, 2005.

 

Panel consists of
Chief Justice Hedges and Justices Fowler and Frost.  (Chief Justice Hedges not participating)

 

Publish.











[1]All references in this opinion to Apounds@ will be to pounds sterling.





[2] At the July 2005 hearing, counsel for Judgment
Creditors stated that a 1.7 dollar-to-pound exchange rate was acceptable for
converting the figure of 6.2 million pounds into dollars.  The trial court also used this exchange rate
in its findings of fact and conclusions of law. 

 





[3] Ramco Energy=s Annual
Report and Financial Statements for 2004 indicate that the consolidated
financial statements were prepared in accordance with UK Generally Accepted Accounting
Principles.





[4] When
asked if posting a $7.5 million bond would cause substantial economic harm to
Ramco Energy, Bratic did not answer the question but instead offered his
observation that interests in seven properties could be placed in the registry
of the court. 





[5] Under Scots law, an inhibition is an order issued
by the Court of Session to prohibit a debtor from encumbering or alienating the
debtor=s heritable property to the
prejudice of a creditor.  See Black=s Law
Dictionary 799 (8th
ed. 2004).





[6]  Moar also testified at the July 2005 hearing
that the Bank of Scotland holds a Afloating
charge@ on the office building that is similar to a Amortgage debenture.@  Even if we presume that Moar testified at the
hearing that the Bank of Scotland holds a mortgage lien on the office building,
the trial court was free to credit the original affidavit testimony of Bertram
and Moar that the office building is an unencumbered asset, and we presume the
trial court did so.

 





[7]All
conversions from pounds to dollars are based on a 1.7 dollar-to-pound exchange
rate used by the Judgment Creditors and trial court below.

 





[8] In its findings, the trial court stated that the Judgment Debtors could
tender title to these seven interests into the registry of the court as
alternate security to supersede the trial court=s
judgment and that doing so would not cause the Judgment Debtors substantial
economic harm.  The trial court indicated
at the July 21, 2005 hearing that the Judgment Creditors agreed that these
interests would be sufficient alternate security.  Because the Judgment Debtors have not sought
to supersede the judgment with this nonmonetary alternate security, this issue
is not before us, and we do not address it.